COREY AIRPORT SERVICES, INC.,

      Plaintiff,

      v.

THE CITY OF ATLANTA, et al.

      Defendants.

CIVIL ACTION

NO. 1:04-CV-3243-CAP

## O R D E R

This matter is now before the court on the following motions: Barbara Fouch's motion for summary judgment [Doc. No. 447]; the City of Atlanta's motion for summary judgment [Doc. No. 448]; Ben DeCosta's motion for summary judgment [Doc. No. 450]; Adam L. Smith's motion for summary judgment [Doc. No. 451]; Carolyn Chavis's motion for summary judgment [Doc. No. 453]; Kyle Mastin's motion for summary judgment [Doc. No. 457]; Hubert Owens's motion for summary judgment [Doc. No. 459]; James Riley, Michael Riley, and John McNeany's motion for summary judgment [Doc. No. 463]; Clear Channel Airports of Georgia, Inc. and Clear Channel Outdoor, Inc.'s motion for summary judgment [Doc. No. 464]; Clear Channel Airports of Georgia, Inc. and Clear Channel Outdoor, Inc.'s motion in limine to exclude evidence and testimony of plaintiff's proffered expert witness John H. Landon [Doc. No. 496]; the joint motion to exclude testimony of Brett Katzman [Doc. No. 571]; the joint motion to strike the declaration of Steve Moody [Doc. No.

575]; and Barbara Fouch's motion to strike the declaration of Steve Moody [Doc. No. 576]. In Section I, the court will outline the factual background of this case. In Section II, the court will address the motion to exclude the testimony of Brent Katzman [Doc. No. 571] and the motions to strike the declaration of Steve Moody [Doc. Nos. 575 and 576]. In Section III, the court will rule on the respective motions for summary judgment as to each count in Corey's Second Amended Complaint [Doc. No. 444]. In doing so, the court will examine the evidence and set out in specificity the facts that are relevant to the particular defendants and the claims against them. Because Landon testifies as to the relevant market and harm to competition, the court will address the motion to exclude the testimony of Landon when it rules on the motions for summary judgment as to Corey's antitrust claims.[1]

## I.   **Factual Background**

This case arises from the City of Atlanta's ("City") Request for Proposal No. FC-7430-02 for the advertising concession at

---

[1]As soon will become evident, the court has need to refer to the various defendants individually and in certain groups. Accordingly, unless otherwise noted, the court will refer: (1) to the City of Atlanta as "the City"; (2) to DeCosta, Mastin, Owens, Smith, and Chavis as "the individual City defendants"; (3) to the City and the individual City defendants as "the City defendants"; (4) to Clear Channel Airports of Georgia, Inc. and Clear Channel Outdoor, Inc. as "Clear Channel"; and (5) to Clear Channel, J. Riley, M. Riley, McNeany, and Fouch as "the private defendants".

Hartsfield-Jackson International Airport ("2002 RFP"). Before addressing the 2002 RFP itself, the court will first discuss the historical background leading up to the 2002 RFP.

**A.    Historical Background of the Airport Advertising Concession and the 2002 RFP**

In 1980, the City's Hartsfield-Jackson International Airport ("Airport") opened. In that same year, James Riley (the owner of Transportation Media, Inc.) and Barbara Fouch partnered to form Transportation Media, Inc. of Georgia ("TMI of Georgia") in order to pursue the contract for the Airport advertising concession. J. Riley owned a 70% interest in TMI of Georgia, and Fouch owned a 30% interest. TMI of Georgia was awarded a 15-year no-bid contract for the Airport advertising concession ("1980 Airport Advertising Contract"). Initially, TMI of Georgia operated the Airport advertising concession as a subcontractor of Dobbs-Paschal Midfield Corp. ("DPMC").

In 1993, the City terminated DPMC's master concessionaire contract. At that time, the City Council authorized a two-year contract directly with TMI of Georgia for the Airport advertising concession based on the 1980 Airport Advertising Contract and at the rate of 50% of revenue received ("1993 Airport Advertising Contract"). In September 1995, the City Council authorized a two-year extension of the contract ("1995 Airport Advertising

Contract"). During this extension, TMI of Georgia continued to pay the City rent at the rate of 50% of revenue received. The term of the 1995 Airport Advertising Contract expired in September 1997, but Clear Channel has continued to operate the Airport concession on a month-to-month basis at the 50% rental rate.

On February 17, 1998, J. Riley signed a consulting agreement, in which TMI of Georgia agreed to pay Fouch an additional $144,000 per year in consulting fees and an additional $50,000 per year bonus for "each year extension of the present airport contract, to a maximum of $250,000 for a 5 year renewal extension, said bonus to be paid concurrent with signing of the extension by the parties thereto." Ex. 13 to Plaintiff's Statement of Facts. That same year, Universal Outdoor Holdings acquired TMI of Georgia. Later that year, Clear Channel's parent corporation acquired the stock of Universal Outdoor Holdings, TMI of Georgia became a subsidiary of Clear Channel, and its name was changed to "Clear Channel Airports of Georgia, Inc." Clear Channel Airports of Georgia, Inc. does not have its own employees. Instead, the people who operate the advertising concession at the Airport on a day-to-day basis are employees of Clear Channel Outdoor, Inc. Under the terms of Clear Channel's response to the 2002 RFP, Fouch's status would change from a 30% owner of Clear Channel Airports of Georgia, Inc. to a subcontractor of Clear Channel Outdoor, Inc. with a right to 30% of

the profits from Clear Channel's operation of the Airport advertising concession.

Between 1997 and 2002, after the term of the 1995 Airport Advertising Contract had expired, Clear Channel was in communication with the City regarding the status of its contract. For example, J. Riley testifies in his deposition, "There was an effort to get a contract continually." Ex. 2 to Plaintiff's Statement of Facts at 162. J. Riley also states that "some people that were working for the company were in negotiations with the airport to get us a contract, open up an RFP" and that "anything is better than a 30-day contract." Id. at 165. In addition, J. Riley testifies that Fouch "was being paid to be [at the Airport] and try to work out a plan where [Clear Channel] could have a bid." Id. at 196.

In 1997, while Angela Gittens was the General Manager of the Airport, a request for proposal for the Airport advertising concession was issued ("1997 RFP"), but the 1997 RFP was soon cancelled prior to the submission of any proposals. The 1997 RFP reduced the number of advertising display locations from approximately 300 to approximately 100. In 1998, Gittens was replaced by Ben DeCosta, who left his position with the Newark International Airport ("Newark Airport").

DeCosta had the responsibility of determining whether and when a new request for proposal for the Airport advertising concession would be issued by the City's Department of Procurement. From 1998 until 2002, no new RFP for the Airport advertising concession was issued and Clear Channel continued to pay the City rent at the 50% rate. The City and DeCosta state that the release of the new RFP was delayed due to revisions of the 1997 RFP. Kyle Mastin, the Concession Manager of the Airport, states that, when he prepared Section III of the 2002 RFP, he used the materials from the 1997 RFP and did little other than update the number of authorized locations.

**B.   Release of the 2002 RFP**

In 2002, the City released the 2002 RFP, which is a request in accordance with the City's competitive sealed proposal method pursuant to the Procurement and Real Estate Code of the City, § 2-1189. Parts I and II of the 2002 RFP, which are entitled "General Information" and "Instructions", were drafted by the City's Department of Procurement under the supervision of Senior Contract Analyst Carolyn Chavis. Chavis began working for the Department of Procurement in 1994 as a contracting officer assigned to the Department of Aviation. In that capacity, she provided procurement services exclusively to the City's Department of Aviation. She was the contracting officer for hundreds of procurements and was

6

promoted to senior contracting officer in 2002. Chavis left her position in 2007.

As the contracting officer assigned to the 2002 RFP, Chavis served as the contact person for the bid proponents. In this capacity, bid proponents would contact Chavis with any questions they had regarding the 2002 RFP. For any substantive questions, bid proponents were to submit the questions in writing, and Chavis would ensure that those questions were answered and attached to the 2002 RFP as an addendum. Questions relating to Part I or Part II of the 2002 RFP were to be answered by the Department of Procurement, while responses to Part III were the responsibility of the Department of Aviation.

Part III of the 2002 RFP, which contains all of the technical provisions, was drafted by the Department of Aviation, specifically Kyle Mastin and Marlene Coleman. Mastin is the Concession Manager for the Airport and served in that capacity when the 2002 RFP was released. Section 3.4 of the 2002 RFP requires bid proponents to project their gross receipts for the first five years of the term of the contract and to commit to pay the City a monthly rental payment of not less than 60% of their gross receipts. Section 3.4 also includes Clear Channel's annual revenue for the years 1996–2001, which were as follows:

| Year | Revenue |
|------|---------|
| 1996 | $5,524,980 |
| 1997 | $4,925,822 |
| 1998 | $5,106,848 |
| 1999 | $6,257,820 |
| 2000 | $9,448,465 |
| 2001 | $7,113,930 |

Section 3.4 also provides for a Minimum Annual Guaranteed payment ("MAG") to protect the City if the contractor fails to attain its projected gross receipts. The first year's MAG is 85% of the bid proponent's projected receipts for the first year, multiplied by the bid proponent's proposed rental percentage. The second year MAG is the greater of the first year MAG or 85% of the second year gross receipts multiplied by the proposed rental payment. Each month, the successful bid proponent is required to pay the City the greater of the rental payment or one-twelfth of the MAG. The RFP specifies that the first rental/MAG payment "will begin on the 31st day after the execution of the agreement even if installation is not complete." ("31-Day MAG Provision"). Ex. 22 to Plaintiff's Statement of Facts. Thereafter, all rental/MAG payments are due monthly in advance.

The 2002 RFP does not require the incumbent concessionaire, Clear Channel, to remove its existing advertising displays in the event a new concessionaire is ultimately awarded the contract. Instead, the 2002 RFP gives Clear Channel the option of either

removing the old displays itself or abandoning them for the new concessionaire to remove. If Clear Channel were to remove its existing signs, it would not be required to do so until the day before the execution of the new agreement.

The 2002 RFP requires that fabrication of new displays be approved by the City before the displays are installed, which would take approximately one month. Furthermore, all people and companies associated with the installation, maintenance, and management of the Airport advertising concession who do not already have security clearance would have to obtain that clearance before they could install and manage the new displays, which the City stated would take approximately sixty days. Corey sent written questions to the City asking whether it would consider extending Clear Channel's contract for an additional sixty days, if a new concessionaire was selected, in order to enable a new concessionaire to design and fabricate its displays and start generating revenue with which to pay the MAG or percentage-based rent after the first thirty-one days. The City would not agree to such an extension.

Section 3.2 of the 2002 RFP, as amended by Addendum 4, entitled "PROJECT DESCRIPTION", sets forth instructions to proponents concerning the scope of their proposals:

> Interested proponents will be proposing to design, install, operate, maintain and manage advertising and hotel/motel courtesy phone boards at the AIRPORT at locations set forth in Exhibit A hereto.
>
> There are approximately three hundred and twenty-seven (327) locations for advertising and three (3) hotel/motel courtesy phone boards in the AIRPORT. The total number of advertising display units included in this RFP may be increased or decreased as deemed necessary by the Aviation General Manager with all units subject to the terms and conditions specified in the related contract. The following is a list of the various locations . . . .

Ex. 22 to Plaintiff's Statement of Facts. Section 3.2 then lists the authorized locations for advertising in the Airport by terminal/concourse and the number of individual locations within each. Section 3.3, as amended by Addendum 4 and entitled "PERMITTED USE", further provides, "The successful proponent will have the non-exclusive right to install, operate, maintain and manage approximately three hundred and twenty-seven (327) advertising display units and three (3) hotel/motel courtesy phone boards in designated locations (listed in section 3.2)." Ex. 22 to Plaintiff's Statement of Facts. The number of authorized display locations is important because, if the number of locations is increased, then the concessionaire can generate additional revenue.

**C.    The Disadvantaged Business Enterprise Requirement and the Certification of Barbara Fouch**

The City administers a Disadvantaged Business Enterprise ("DBE") program in connection with its public contracts, including

the contract at issue in the 2002 RFP. Because the City accepts federal funding for the Airport, the DBE program is subject to the federal DBE rules promulgated by the U.S. Department of Transportation, which are codified at 49 C.F.R. §§ 23 and 26 (2005). Under those rules, a DBE firm is one that is at least 51% owned by one or more individuals who are both socially and economically disadvantaged and whose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it. 49 C.F.R. § 26.5 (2005). Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias within society because of their identities as members of certain groups and without regard to their individual qualities. 49 C.F.R. § 26, app. E (2005). Economically disadvantaged individuals are socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged. 49 C.F.R. § 26, app. E (2005).

The City, as a recipient of federal transportation funding, must insure that the DBEs it certifies are actually owned and controlled by disadvantaged individuals by scrutinizing the relationships of the purported DBE firms with non-DBE firms in such

areas as personnel, facilities, equipment, financial and bonding support, and other resources. 49 C.F.R. § 26.71(b)(1) (2005). As part of that scrutiny, for each DBE applicant the City must: conduct an on-site visit to the applicant's offices; analyze the firm's stock ownership, bonding, and financial capacity; compile a list of equipment owned by the firm; compile a list of licenses held by key personnel within the firm; and require applicants to complete and submit a DBE application form. 49 C.F.R. § 26.83 (2005).

Fouch, doing business as Creative Media Displays of Georgia, submitted a DBE application to the City on June 5, 2002. Fouch's DBE application and supporting materials stated that she owned 30% of Clear Channel Airports of Georgia, Inc. The DBE application and supporting materials also revealed that she owned a Beverly Hills, California-based firm called "Fouch-Roseboro & Associates" and that she owned a majority share of Creative Media Displays, Inc., a New York corporation that is a subcontractor to the Newark Airport advertising contract. Fouch's DBE application and supporting materials stated that the business for which she sought DBE certification, Creative Media Displays of Georgia, owned no business equipment and had executed a sublease with its non-DBE partner, Clear Channel, the month before filing its DBE application.

Owens is the Director of the City's Office of Contract Compliance ("OCC") and served in that capacity when Fouch submitted her DBE application, and he oversaw and gave final approval of Fouch's DBE application. It is uncontested that Owens and his office made mistakes in the DBE certification process. For example, neither Owens nor anyone else in his office conducted the required site visits for any of the DBEs that were certified in connection with the 2002 RFP, but Owens and his office did not conduct any site visits for any DBE applicants in connection with any City contracts prior to 2003. There is also evidence, however, that Owens and his office more throughly examined the DBE application of Maureen Malone, doing business as Sydney Baxter & Co., who partnered with Corey for the 2002 RFP.

The City set a DBE participation goal of at least 29% for the Airport advertising concession, which required that each bid proponent make a good faith effort to have DBEs perform at least 29% of the contract. All three bid proponents received the full 15 point allocation for satisfying the City's DBE goal.

**D.    The 2002 RFP Process:    Selection of Clear Channel as Highest-Ranked Proponent and Corey's Protest**

During the 2002 RFP process, the City received and responded to multiple questions from potential and actual proponents. As the contact person, Chavis was responsible for ensuring that these

questions were directed to the correct department, answered, and then attached to the 2002 RFP as an addendum. Corey submitted more than 31 questions to the City in letters dated May 7, 2002, and May 8, 2002, all of which were answered by the City. Corey submitted four additional questions to the City in a letter dated July 15, 2002, and those questions were never answered. In addition, Chavis responded to questions in writing from Clear Channel and JCDecaux North America (a company that ultimately did not submit a proposal). There is also evidence that Chavis responded verbally to two non-substantive questions from Clear Channel and also sent a fax to Fouch.

Ultimately, three companies submitted proposals in response to the 2002 RFP: Creative Airport Advertising, Corey, and Clear Channel. In its bid, Corey offered to pay 72.1% of its gross receipts to the city. Clear Channel offered to pay 61.1% of its gross receipts. In addition, Clear Channel and Corey made the following five-year revenue projections:

|  | Corey | Clear Channel |
|---|---|---|
| Year 1 | $ 9,273,636 | $10,109,777 |
| Year 2 | $10,201,000 | $12,471,244 |
| Year 3 | $11,221,100 | $14,766,931 |
| Year 4 | $12,343,210 | $16,831,970 |
| Year 5 | $13,577,530 | $20,206,766 |

John McNeany prepared the pro forma that contained Clear Channel's revenue projections and that was included with Clear Channel's

proposal.  Based on these numbers, Corey's MAG for the first year would have been 85% of $9,273,635 multiplied by its proposed 72.1% rental rate, which would have amounted to $5,683,347.83.  Clear Channel's MAG for the first year would have been 85% of $10,109,777 multiplied by 61.1%, which would have amounted to $5,250,513.

Though the 2002 RFP states that the successful proponent would have the right to manage approximately 327 display locations, there is evidence that Clear Channel did not limit its proposal to that number of locations and based its revenue projections on the assumption that there would be significantly more than 327 advertising displays.  For example, Michael Riley (who is J. Riley's son and the President of Clear Channel Airports, a division of Clear Channel) testifies in his deposition that Clear Channel identified "a lot of additional locations" for its proposal and that those locations were "certainly not limited to" the locations authorized in the 2002 RFP.  Ex. 39 to Plaintiff's Statement of Facts at 110.  Clear Channel's proposal, however, indicates that its proposal was based on 334 displays, an increase of only seven additional locations.  Ex. 39 to Plaintiff's Statement of Facts at 110.  In addition, J. Riley has testifies that Clear Channel based its response to the 2002 RFP "on a large number of new signs."  Ex. 2 to Plaintiff's Statement of Facts at 173.

The City's proposal evaluation team, which consisted of Mastin, Coleman, Charles Ewing, and Paul Meyer, evaluated and scored each of the proposals on a 100-point scale in the following categories:

| Categories | Points |
|---|---|
| General and Specialized Experience | 10 |
| Past Performance and Experience | 10 |
| Performance Capabilities | 10 |
| Business Plan | 10 |
| Fee (MAG and Percentage Rent Proposed) | 35 |
| Financial Condition | 10 |
| Disadvantaged Business Enterprise | 15 |
| Ability to Comply with Applicable Laws | Pass/Fail |
| Ability to Comply with Constr. Schedule | Pass/Fail |

The City's proposal evaluation team ultimately scored the proposals as follows:

| Offeror | Points |
|---|---|
| Clear Channel | 82.55 |
| Corey | 79.18 |
| Creative Airport Advertising | 72.05 |

Felicia Strong Whitaker of the Department of Procurement then sent a letter dated May 8, 2002, to Clear Channel that informed Clear

Channel that it "had been selected as the top ranked proponent."
Ex. 46 to the Plaintiff's Statement of Facts.

On November 14, 2002, Corey filed a protest of the City's recommendation and selection of Clear Channel as the highest-ranked (and therefore most responsible and responsive) bid proponent. On November 14, 2002, the City and Clear Channel held negotiations regarding the final terms of the contract for the Airport advertising concession. The City was represented by Kyle Mastin and Toni Darden, and Clear Channel was represented by J. Riley, M. Riley, and McNeany. DeCosta was the City representative responsible for the presentation of the recommendation of Clear Channel to the City Council and for the presentation of legislation approving the final contract with Clear Channel, the terms of which had been finalized during the November 14, 2002, negotiations. DeCosta did not immediately present the contract and legislation to the City Council for approval. DeCosta claims that he did not submit the recommendation and legislation to the City Council because of Corey's protest.

Adam Smith took office as the city's Chief Procurement Officer in January 2003. Smith was aware of the allegations that Corey made in its bid protest. Smith believed that he had the authority to investigate Corey's allegations and rebid the contract, but he did neither of these. According to Smith, he did not conduct an

17

independent investigation or cancel the 2002 RFP and rebid the contract because the procurement took place prior to his employment with the City and because of the protest and litigation regarding the 2002 RFP. There is a letter, however, that states that the Department of Procurement had reviewed the 2002 RFP and "concluded that the City did not follow the established procurement process in such a manner as to serve the best interests of the City." Ex. 56 to Plaintiff's Statement of Facts. The letter further states that the City had decided to cancel the 2002 RFP, reject all of the proposals, and issue a new RFP. The letter indicates that it was sent from Smith to M. Riley, with copies sent to DeCosta and Owens (as well as others). The letter, however, does not have Smith's handwritten signature, and Smith denies knowledge of the letter.

### E.    The 2002 RFP Process:  Reopening of Negotiations

On November 1, 2004, approximately two years after the November 14, 2002, negotiations between Clear Channel and the City, DeCosta submitted the recommendation of Clear Channel as most responsible and responsive bid proponent and the legislation necessary to approve the contract with Clear Channel. On November 4, 2004, Corey filed the instant lawsuit [Doc. No. 1]. According to DeCosta and the City, the City Council withheld approving the contract pending the outcome of the protest and litigation. Clear

Channel continued to pay the 50% rental rate on a month-to-month basis.

Early in 2005, Mastin called McNeany and told him that DeCosta wanted Clear Channel to start paying the percentage rate that Clear Channel had proposed in its response to the 2002 RFP, which was 61.1% of the advertising revenue. Also early in 2005, DeCosta and J. Riley had a phone conversation regarding the rate Clear Channel was paying, and, according to DeCosta, J. Riley and DeCosta reached a verbal agreement that Clear Channel would start paying the 61.1% rate beginning retroactively on January 1, 2005.

Sometime in 2006, DeCosta learned that Clear Channel had not been paying the increased rental rate. DeCosta then contacted Clear Channel to explain that he expected Clear Channel to pay the increased rental rate in accordance with the verbal agreement that he had with J. Riley. DeCosta also told Clear Channel that it should pay interest on the amount past due at the rate specified in the 1995 Airport Advertising Contract. DeCosta contacted either J. Riley or Fouch and communicated that, if Clear Channel did not honor the agreement that DeCosta had reached with J. Riley, then the City would rebid the contract. Ex. 8 to Plaintiff's Statement of Facts at 246.

At some point, DeCosta increased his demand from 61.1% to 61.2%. In response, Sam Hart of Clear Channel sent a letter to

Mastin, dated May 3, 2006, telling him that Clear Channel would agree to pay the 61.2% rate "retroactive to twelve (12) calendar months from the effective date of the new Concessions Operating Agreement" in exchange for, among other things, the City agreeing to authorize an increase in the number of display locations. Ex. 61 to Plaintiff's Statement of Facts. In that letter, Hart went on to state that, since Clear Channel would not be able to "retroactively recover the aforementioned twelve months of missed sales opportunities on existing inventory, the revenues we are able to generate on these new display locations will help us offset the impact of the retroactive payment on our current fiscal year." Id.

DeCosta continued to negotiate with Clear Channel and Fouch throughout 2006, and, at some point, Clear Channel agreed to the increased rental rate and a lump sum payment of back rent. On November 30, 2006, Fouch sent an email to M. Riley stating that the City expected to receive the check by December 4, 2006. Fouch went on to state that she had "met with Ben [DeCosta] and a determination of 'where we all go from here' is, hopefully secured." Ex. 63 to Plaintiff's Statement of Facts.

On December 4, 2006, Clear Channel sent a check to the City in the amount of $1,739,659.00. Fouch conveyed the check and an accompanying letter to DeCosta. The reference line of the check indicates that it was payment for back rent. In the letter, M.

Riley stated, "In consideration for the new display advertising locations at the Airport, [Clear Channel] will pay the Airport a one-time upfront payment of $1,739,659.00, which is enclosed herewith." Ex. 64 to Plaintiff's Statement of Facts. In addition, Clear Channel agreed to pay the 61.2% rental rate beginning as of November 1, 2006. On March 7, 2007, Clear Channel sent a second check for $100,000.00 in order to cover back rent for the months of October and November 2006. Clear Channel is the current Airport advertising concessionaire.

## II. Motion to Exclude Testimony of Brett Katzman, Ph.D. [Doc. No. 571] and Motion to Strike Declaration of Steve Moody [Doc. No. 575]

The defendants have filed a joint motion to exclude the testimony of Brett Katzman [Doc. No. 571] and a joint motion to strike the declaration of Steve Moody [Doc. No. 575]. The court notes that Fouch did not originally join in the motion to strike the declaration of Moody, but she subsequently filed a motion entitled, "Motion to Strike the Declaration of Steve Moody" [Doc. No. 576], which, rather than being a separate motion to strike, indicated merely that she wanted to adopt and join in the other defendants' motion [Doc. No. 575]. Accordingly, the court holds that Fouch has joined in the other defendants' motion to strike [Doc. No. 575], and the court will rule on that motion on its

merits.  The court therefore dismisses as moot Fouch's separate
motion [Doc. No. 576].

### A. Motion to Exclude Testimony of Brett Katzman [Doc. No. 571].

In support of its claims, Corey seeks to present the
testimony of Professor Brett E. Katzman, Ph.D., who is an
Associate Professor of Economics in the Coles College of
Business, Kennesaw State University.  According to Corey, Katzman
is an expert in competitive bidding.  Though the Procurement and
Real Estate Code of the City distinguishes between competitive
sealed bids and competitive sealed proposals, it is clear that
requests for proposals in general and the 2002 RFP in particular
involve competitive bidding by the proponents.  The defendants
contend, however, that Katzman is not qualified to give expert
testimony on the particular facts at issue in this case.
Moreover, the defendants argue that Katzman's opinions are not
sufficiently reliable to meet the standards of admissibility set
forth in Rule 702 of the Federal Rules of Evidence and by the
United States Supreme Court in <u>Daubert v. Merrell Dow
Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).  Furthermore, the
defendants contend that Katzman's opinions are not the proper
subject of expert testimony because Katzman cannot testify about
the subjective intent of the defendants, the opinions relate to

matters within the common understanding of lay persons, and the opinions include inadmissible legal conclusions and lawyer arguments. Finally, the defendants claim that Katzman's declaration, which was submitted with Corey's responses to the defendants' motions for summary judgment, contains new opinions that were not previously disclosed in his prior reports and are therefore untimely pursuant to the court's amended scheduling order [Doc. No. 251].

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; <u>see also</u> <u>Daubert</u>, 509 U.S. at 585-97. Determinations regarding the admissibility of such testimony are controlled by Rule 702, as explained by the Supreme Court in <u>Daubert</u> and its progeny. <u>City of Tuscaloosa v. Harcros Chemicals, Inc.</u>, 158 F.3d 548, 562 (11th Cir. 1998).

The district court is obligated to act as a gatekeeper to the admission of expert testimony by ensuring that it "both rests on a

reliable foundation and is relevant to the task at hand." <u>Daubert</u>, 509 U.S. at 597. The objective of the gatekeeping "requirement is to ensure the reliability and relevancy of expert testimony" by making "certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152 (1999). In its gatekeeper role, the district court must engage in a three-part inquiry to determine the admissibility of expert testimony. <u>Tuscaloosa</u>, 158 F.3d at 562. Specifically, the court considers whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." <u>Id.</u> at 562; <u>see also</u> <u>Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1340-41 (11th Cir. 2003). The proponent of expert testimony bears the burden of demonstrating that the expert and his or her testimony meets this tripartite standard. <u>McDowell v. Brown</u>, 392 F.3d 1283, 1298 (11th Cir. 2004). This same standard applies to all expert testimony, including

testimony regarding scientific, technical, and other specialized matters.  Kumho Tire, 526 U.S. at 147.

Based on the factors set forth in Daubert, the Eleventh Circuit has held, "In ascertaining the reliability of a particular **scientific** expert opinion, we consider, to the extent possible: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community."  Quiet Technology, 326 F.3d at 1341 (citing McCorvey v. Baxter Healthcare Corp. 298 F.3d 1253, 1256 (11th Cir. 2002) and Daubert, 509 U.S. at 593-94) (emphasis added). The Supreme Court, however, has cautioned, "Those factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.  Kumho, 526 U.S. at 151.  The Supreme Court has also noted that, in some cases, "the relevant reliability concerns may focus upon personal knowledge or experience."  Id. at 150.

"In the end, although 'rulings on admissibility under Daubert inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology,' it is not the role of the district court to make ultimate conclusions as to the

persuasiveness of the proffered evidence." Quiet Technology, 326
F.3d at 1341 (quoting McCorvey, 298 F.3d at 1256).  "A district
court's gatekeeper role under Daubert 'is not intended to supplant
the adversary system or the role of the jury.'"  Maiz v. Virani,
253 F.3d 641, 666 (11th Cir. 2001) (quoting Allison v. McGhan 184
F.3d 1300, 1311 (11th Cir. 1999)).  Instead, as the Supreme Court
has stated, "vigorous cross-examination, presentation of contrary
evidence, and careful instruction on the burden of proof are the
traditional and appropriate means of attacking shaky but admissible
evidence."  Daubert, 509 U.S. at 596.

### 1.   Whether the Expert is Qualified

As the court noted previously, Katzman is an Associate
Professor of Economics in the Coles College of Business, Kennesaw
State University.  He has held similar positions at the University
of Miami and Mercer University.  Katzman received his doctorate in
1996 based on course work that included classes on auctions,
procurements, and competitive bidding, as well as his dissertation,
entitled A Theoretical and Empirical Analysis of Multi-Unit
Auctions with Multi-Unit Demands.  Since receiving his Ph.D.,
Katzman has taught courses in Industrial Organization, Economics of
Strategy, Game Theory, Theoretical Microeconomics, and Managerial
Economics at the undergraduate, Masters, and Ph.D. levels.  Katzman
states that all of these courses have contained some element of

competitive bidding, including process design, bidding strategy, or empirical analysis of results.

Katzman has written research papers on competitive bidding encompassing both auctions and procurement settings, several of which have been published in highly regarded economics journals such as <u>The Journal of Economic Theory</u> and <u>Economic Theory</u>. These papers have usually focused on three areas: (1) process design; (2) bidding strategies; or (3) empirical analysis of bidding results. In addition, Katzman has served as a referee of manuscripts on competitive bidding for various journals, including <u>The American Economic Review</u>, <u>The Journal of Economic Theory</u>, the <u>RAND Journal of Economics</u>, and the <u>Review of Economics and Statistics</u>.

The defendants do not contest Katzman's particular academic credentials. Instead, they argue that Katzman is not qualified to testify as an expert in this case because he has no independent education, training, or experience in municipal RFPs and procurements or, more specifically, airport concession RFPs and procurements. The defendants further argue that Katzman is not qualified because his testimony was prepared solely for litigation. Corey, however, argues that Katzman's extensive expertise in competitive bidding in general qualifies him to testify and that

Katzman's expertise was not prepared solely for this litigation. The court agrees with Corey.

Even though he has not specialized in airport concession RFPs or municipal RFPs, Katzman has an extensive background in competitive bidding, including his education, research, teaching, and publications, which has provided him with specialized knowledge that the average person does not possess. Furthermore, though he prepared in part for his testimony in this case by reviewing various airport-related RFPs and other evidence in this case, Katzman has an extensive background in competitive bidding, which he has developed through years of study and research that predate this litigation. Though this case involves a request for proposal rather than an invitation for bid, there is no question that the 2002 RFP had competitive bidding characteristics. Thus, the court finds Katzman to be qualified to render an opinion in this case based on his expertise in competitive bidding.

### 2. Whether the Expert has Employed a Sufficiently Reliable Methodology

Though the court must focus on the methodology of the proffered expert, "conclusions and methodology are not entirely distinct from one another." General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997). In addition, as the Supreme Court has stated, "Trained experts commonly extrapolate from existing data."

_Id._  The Supreme Court, however, has emphasized, "Nothing in either _Daubert_ or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  _Id._

The defendants argue that "Katzman's methodology is no methodology at all" and that Katzman's reliance on his expertise and training with regard to competitive bidding is not reliable because such "self-proclaimed expertise is not a substitute for proof of a reliable methodology."  Defendants' Brief at 20 [Doc. No. 571].  Though the defendants are correct that experience alone does not guarantee reliability, the court disagrees with the defendants' assessment of Katzman's testimony.

In reviewing Katzman's testimony, the court finds that Katzman has sufficiently connected his extensive experience and expertise to his testimony and has sufficiently explained his methodology in reviewing the 2002 RFP.  Essentially, Katzman has reviewed the 2002 RFP and other evidence in this case and applied his education and expertise in competitive bidding to that evidence.  As the court has already noted, the list of factors enumerated in _Daubert_ for evaluating the methodology employed by an expert witness is not always relevant to evaluating the reliability of expert testimony.

On the facts of this case, the court holds that most of these factors are inapplicable, but the court notes that Katzman has published articles in peer-reviewed journals on the topic of competitive bidding, served as a referee of manuscripts on competitive bidding, and taught courses involving the topic of competitive bidding. In this case, the most relevant reliability concerns are the personal knowledge, education, and experience of Katzman, and Corey has demonstrated that Katzman has an extensive academic background in competitive bidding.

Furthermore, the court is satisfied that Katzman has not relied on mere speculation in giving his opinions. Instead, Katzman goes into detail in explaining how he reached his conclusions, and the trier of fact can evaluate Katzman's reasoning and how he reached his conclusions. The defendants obviously object to Katzman's opinions, but the court holds that these objections go to the weight and not the admissibility of Katzman's testimony. The defendants will have their opportunity to cross-examine Katzman and call into question his testimony. But it is not the court's role to rule on the persuasiveness of the proffered testimony. Although Katzman's methodology may not be susceptible to testing, the court finds that, in this case, Katzman's expertise, experience, and education and his application of general economic principles to the facts of this case are sufficient for

establishing that he has employed a reliable methodology in analyzing the 2002 RFP and its implementation.

### 3. Whether the Expert Testimony Will Assist the Trier of Fact

The defendants advance four arguments in support of their claim that Katzman's testimony will not assist the trier of fact. First, the defendants argue that Katzman testifies to the intent and motivation of some of the defendants and expert testimony is not admissible on the issue of the parties' intent. The court notes that the defendants do not cite any Eleventh Circuit authority in support of their argument. It is true that, in a criminal case, an expert cannot "state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." Fed. R. Evid. 704(b). But, at least with regard to civil cases, the Eleventh Circuit has held, "An expert may testify as to his opinion on an ultimate issue of fact." Montgomery v. Aetna Casualty & Surety Co., 898 F.2d 1537, 1541 (11th Cir. 1990).

The court has reviewed the relevant portions of Katzman's testimony and finds that, in this case, Katzman's testimony will assist the trier of fact in determining whether the 2002 RFP process was biased in favor of the incumbent Clear Channel and to

the detriment of all non-incumbent bid proponents, including Corey. Katzman is an expert in competitive bidding, and he has reviewed the 2002 RFP and other evidence in this case. Katzman can assist the trier of fact by explaining, for example, the terms of the 2002 RFP, how the solicitation process was implemented, whether such implementation was biased, and the basis of his opinion that the terms of the 2002 RFP were biased in favor of the incumbent Clear Channel. If the trier of fact believes such testimony, then the trier of fact could infer that the terms of the 2002 RFP and the administration of the RFP process demonstrate that the City defendants intentionally discriminated against Corey.

Second, the defendants argue that Katzman's opinions concern matters within the common understanding of the lay person. Though some of Katzman's testimony might fall within the understanding of the lay witness, much of it goes beyond such understanding, in that, Katzman is applying his expertise in competitive bidding to the terms of the 2002 RFP and the facts giving rise to this case. The average lay person has very little experience with RFPs, how they are administered, and competitive bidding in general. Thus, Katzman's expertise goes beyond the understanding of the average lay person and may assist the trier of fact in understanding certain issues in this case.

Third, the defendants argue that Katzman's opinions constitute inadmissible legal conclusions. In support of this argument, the defendants cite <u>Montgomery</u>, in which the Eleventh Circuit held, "A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law." <u>Montgomery</u>, 898 F.2d 1537 at 1541. On this issue, the court agrees with the defendants. Katzman may not give his opinion as to the legal implications of the defendants' conduct. But Katzman may give his opinions to things such as whether the terms of the 2002 RFP were biased, whether the scoring of the proposals was manipulated, whether the conduct of the defendants favored the incumbent Clear Channel to the disadvantage of non-incumbent proponents such as Corey. Accordingly, the court grants the defendant's motion as to those portions of Katzman's declaration that constitute inadmissible legal conclusions, and, in ruling on the motions for summary judgment, the court will not rely upon that testimony.

Fourth, the defendants argue that Katzman's opinions constitute inadmissible argument. The court has reviewed the portions of Katzman's declaration to which the defendants object, and the court finds that the relevant testimony does not constitute inadmissible argument. To the contrary, the testimony at issue may assist the trier of fact in determining an ultimate issue of fact in this case, i.e., whether the defendants intentionally

33

discriminated against Corey. For example, the defendants object to Katzman's conclusion "that the 2002 Atlanta advertising RFP, as written and implemented, was intentionally biased in favor of the Incumbent to the prejudice and exclusion of Corey and all other Proponents." Katzman Declaration ¶ 95 [Doc. No. 557]. Katzman, however, explains why he reaches this conclusion, and, if the trier of fact believes Katzman, then the trier of fact may infer that the City defendants intentionally discriminated against Corey. Accordingly, the court holds that Katzman's testimony may assist the trier of fact in determining an ultimate issue of fact in this case and is therefore admissible.

Finally, the defendants argue that Katzman's declaration should be excluded because it contains new opinions that were not timely disclosed pursuant to the court's scheduling order. The court has reviewed the portions of the declaration of Katzman to which the defendants object and finds that either: (1) the information and opinions to which those paragraphs pertain has been disclosed by Corey prior to the May 25, 2008, deadline or (2) the failure of the disclosure is harmless since the defendants had access to Katzman's expert report, rebuttal report, and the information Katzman used as the basis for his opinions. The portions of the declaration to which the defendants object are merely more detailed explanations of the testimony that Katzman has

given previously.  Accordingly, the court grants in part and denies in part the defendants' motion to exclude the testimony of Brett Katzman.  In ruling on the motions for summary judgment, the court will not rely upon any legal conclusions that may be contained in Katzman's testimony.

**B.   Joint Motion to Strike the Declaration of Steve Moody [Doc. No. 575].**

As an initial matter, the court notes that the defendants have styled their motion to exclude the testimony of Moody as a motion to strike.  Several district courts in the Eleventh Circuit have held that a motion to strike is not the proper method for challenging the admissibility of evidence in an affidavit.  <u>See, e.g.</u>, <u>Lentz v. Hospitality Staffing Solutions, LLC</u>, No. 1:06-cv-1893-WSD, 2008 WL 269607 at *9 (N.D. Ga. Jan. 28, 2008) (noting that Federal Rule of Civil Procedure 12(f) permits the court to strike a pleading, not an affidavit attached to a motion for summary judgment); <u>see also</u> <u>Jordan v. Cobb City, Ga.</u>, 227 F.Supp.2d 1322, 1346-47 (N.D. Ga. 2001); <u>Morgan v. Sears, Roebuck and Co.</u>, 700 F.Supp. 1574, 1576 (N.D. Ga. 1988).  The court in <u>Lentz</u> concluded, "The proper method to challenge such an affidavit is to challenge the admissibility of the evidence contained in the affidavit."  2008 WL 269607 at *9; <u>see also</u> <u>Pinkerton & Laws Co. v. Roadway Express, Inc.</u>, 650 F.Supp. 1138, 1141 (N.D. Ga. 1986)

35

(concluding that a party should file a notice of objection rather than a motion to strike to challenge the admissibility of evidence in an affidavit).

On the other hand, the Eleventh Circuit has held that a district court's granting of a motion to strike an affidavit is reviewed for abuse of discretion. <u>Reese v. Herbert</u>, 527 F.3d 1253, 1263 (11th Cir. 2008). In <u>Reese</u>, the court ultimately affirmed the district court's order, but the Eleventh Circuit specifically held, "We find no abuse of discretion in the district court's decision to **exclude** Keller's affidavit." <u>Id.</u> at 1265 (emphasis added). The Eleventh Circuit has also denied a motion to strike declarations on the grounds that "it is in the interests of justice and efficiency to consider the supplemental declarations" and without considering whether a motion to strike a declaration was procedurally improper. <u>Ouachita Watch League v. Jacobs</u>, 463 F.3d 1163, 1171 (11th Cir. 2006). In addition, Federal Rule of Evidence 103 states that it is error to admit evidence only if "a substantial right of the party is affected" and "a timely objection or **motion to strike** appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context" (emphasis added). Thus, Rule 103 implicitly recognizes that a motion to strike evidence is procedurally proper. Regardless, the court will construe the

defendants' motion to strike as a motion in limine to exclude the challenged testimony of Moody.

In the briefing of their motion, the defendants point out that they seek to exclude paragraphs 8, 12-16, 20-21, and 23 of Moody's declaration on the grounds that those paragraphs are expert testimony, yet Corey did not disclose Moody as an expert witness and he did not disclose an expert report.  In response, Corey argues that the relevant paragraphs are either not opinion testimony or constitute admissible lay opinion testimony.

Federal Rule of Civil Procedure 26(a)(2)(A) requires that a party must disclose the identity of any expert witnesses that the party may use at trial pursuant to Federal Rule of Evidence 702, 703, or 705.  Federal Rule of Civil Procedure (26)(a)(2)(B) further requires the disclosure must be accompanied by a written report that includes certain information related to the qualifications and background of the witness and the testimony itself.  In addition to the requirements of the Federal Rules of Civil Procedure, the local rules of this court state:

> Any party who desires to use the testimony of an expert witness shall designate the expert sufficiently early in the discovery period to permit the opposing party the opportunity to depose the expert and, if desired, to name its own expert witness sufficiently in advance of the close of discovery so that a similar discovery deposition of the second expert might also be conducted prior to the close of discovery.

L.R. 26.2C. If a party fails to comply with this provision of the local rules, then the party shall not be allowed to offer the testimony of the expert witness. L.R. 26.2C. In this case, it is undisputed that Corey did not designate Moody as an expert witness. Therefore, to the extent that the relevant portions of Moody's declaration constitute expert testimony, the court will exclude that testimony.

Federal Rule of Evidence 701 states, "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Interpreting Federal Rule of Evidence 701(c), the Eleventh Circuit has held lay witness opinion testimony based upon the witness's "*particularized knowledge* garnered from years of experience within the field" and not based upon "**specialized knowledge that is subject to Federal Rule of Evidence 702**" is admissible. Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., LTD, 320 F.3d 1213, 1223 (11th Cir. 2003) (emphasis added). "[T]he ability to answer hypothetical questions is '[t]he essential difference' between expert and lay witnesses." United States v.

Henderson, 409 F.3d 1293, 1300 (11th Cir. 2005) (quoting Asplundh
Manufacturing Division v. Benton Harbor Engineering, 57 F.3d 1190,
1202 n.16 (3d Cir. 1995)).

The court finds that some of the relevant testimony is
inadmissible expert testimony, in particular, paragraph 14, in
which Moody states, "No airport advertising professional could have
legitimately projected such revenues [$74,386,688 over a five-year
period] under the terms of the 2002 Atlanta RFP Request for
Proposal, which limited Proponents to 327 locations." Moody
Declaration at ¶ 14 [Doc. No. 575-2]. This testimony is not an
inference based on his particularized knowledge. Instead, as he
notes in the beginning of paragraph 14, Moody's opinion is based on
his specialized knowledge as "an airport advertising professional."
Id. This testimony is essentially an answer to a hypothetical
question, such as, "Could an airport professional legitimately make
a revenue projection such as the one that Clear Channel made under
the terms of the 2002 RFP, which limited proponents to basing their
projection on approximately 327 advertising locations?" As such,
this testimony is governed by Rule 702. Accordingly, the court
finds that this testimony is expert testimony and must be excluded
since Corey did not disclose Moody as an expert witness.

Other testimony in Moody's declaration, however, is not expert
testimony. For example, in paragraph 13, Moody states that he

examined the Pro Forma that Clear Channel submitted to the City and that the Pro Forma contains Clear Channel's projected revenue and expenses for the first five years of the proposed contract. The defendants argue that Moody's testimony should be excluded because it is based on a forensic examination of the files in preparation for litigation. The court disagrees. Moody played an integral role throughout Corey's preparation and presentation of its RFP, and he can give testimony related to his role and his knowledge of the facts of the case, including testimony based on his review of documents during the course of litigation. Thus, the court holds that paragraph 13 is admissible testimony.

For the reasons stated above, the court grants in part and denies in part the defendants' joint motion to strike the declaration of Moody [Doc. No. 575]. In ruling on the motions for summary judgment, the court will not rely upon the testimony of Moody that constitutes prohibited expert testimony.

### III. The Motions for Summary Judgment

Each of the defendants has moved for summary judgment as to all counts against them. Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and . . . the moving party is

entitled to judgment as a matter of law." The party seeking summary judgment bears the burden of demonstrating that no dispute as to any material fact exists. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 156 (1970); <u>Johnson v. Clifton</u>, 74 F.3d 1087, 1090 (11th Cir. 1996). The moving party's burden is discharged merely by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support [an essential element of] the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. <u>Clifton</u>, 74 F.3d at 1090. Once the moving party has adequately supported its motion, the nonmovant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

In deciding a motion for summary judgment, it is not the court's function to decide issues of material fact but to decide only whether there is such an issue to be tried. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251 (1986). The applicable substantive law will identify those facts that are material. <u>Id.</u>, 477 U.S. at 247. Facts that in good faith are disputed, but which

do not resolve or affect the outcome of the case, will not preclude the entry of summary judgment as those facts are not material.  <u>Id.</u>

Genuine disputes are those by which the evidence is such that a reasonable jury could return a verdict for the nonmovant.  <u>Id.</u> In order for factual issues to be "genuine" they must have a real basis in the record.  <u>Matsushita</u>, 475 U.S. at 586.  When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."  <u>Id.</u> (citations omitted).

Corey's Second Amended Complaint [Doc. No. 444] contains five counts in it.  In Count I, Corey alleges that the City defendants deprived it of its constitutional right to equal protection.  In Count II, Corey alleges that all of the defendants conspired to violate its constitutional right to equal protection.  In Count III, Corey seeks attorney fees from all defendants pursuant to 42 U.S.C. § 1988(b) due to their alleged violation of its constitutional right.  In Count IV, Corey brings a claim against the private defendants on the grounds that they conspired to restrain trade and conspired to monopolize.  Finally, in Count V, Corey brings a monopolization and attempted monopolization claim against the private defendants.

**A.  Count I:  Violation of Right to Equal Protection**

The City defendants have all moved for summary judgment as to Corey's claim brought pursuant to 42 U.S.C. § 1983 and set forth in Count I of the complaint.  "By its terms, section 1983 provides a cause of action for 'person[s] within the jurisdiction' who have been 'depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws' by a person acting 'under color of statute, ordinance, regulation, custom, or usage, of any State."  Primer Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County, 450 F.3d 1295, 1305 (11th Cir. 2006) (quoting 42 U.S.C. § 1983).   The Eleventh Circuit has held that corporations are persons within the meaning of Section 1983 and have standing to bring claims under Section 1983.  Id.  In addition, municipalities are persons within the meaning of Section 1983, such that they may be liable under Section 1983.  Pattee v. Georgia Ports Authority, 477 F.Supp.2d 1253, 1260 (11th Cir. 2006) (citing Monell v. N.Y. City Department of Social Services, 436 U.S. 658 (1978)).

"Section 1983 alone creates no substantive rights; rather it provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws."  Barfield v. Brierton, 883 F.2d 923, 934 (11th Cir. 1989).  Thus, in order to sustain a Section 1983 claim, a plaintiff "must establish two elements: (1) that [it] suffered a deprivation of 'rights privileges or

43

immunities secured by the Constitution and laws' of the United States, and (2) that the act or omission causing the deprivation was committed by a person acting under color of law." Wideman v. Shallowford Commmunity Hospital, Inc., 826 F.2d 1030, 1032 (11th Cir. 1987) (quoting Dollar v. Haralson County, 704 F.2d 1540, 1542-43 (11th Cir. 1983)). In this case, Corey alleges that the City defendants have deprived it of its rights under the Fourteenth Amendment's Equal Protection Clause.

"Equal protection claims are not limited to individuals discriminated against based on their membership in a vulnerable class." Campbell v. Rainbow City, Alabama, 434 F.3d 1306, 1313 (11th Cir. 2006). Instead, "the Equal Protection Clause requires government entities to treat similarly situated people alike." Id. The Eleventh Circuit has stated that equal protection claims can be divided into three general categories: (1) claims that a statute discriminates on its face, (2) claims that the neutral application of a facially neutral statute has a disparate impact, and (3) claims that a facially neutral statute is being unequally administered. E&T Realty v. Strickland, 830 F.2d 1107, 1112 n.5 (11th Cir. 1987). In the case at hand, the relevant DBE regulations are not facially neutral since they seek to favor specifically certain groups who qualify as DBEs and those who work with DBEs. But Corey does not bring its claims on this basis.

44

Instead, though Corey's complaint and briefs are not models of clarity on this point, Corey claims that the City defendants unequally applied the facially neutral Procurement and Real Estate Code of the City (and the facially neutral terms of the 2002 RFP) by unequally administering the 2002 RFP process in favor of Clear Channel.

"In order to prevail on an equal protection claim based upon the application of a facially neutral statute, it must be establish[ed] that: (1) the plaintiff was treated differently than similarly situated persons; and (2) the defendant unequally applied the facially neutral statute for the purpose of discriminating against the plaintiff." Strickland v. Alderman, 74 F.3d 260, 264 (11th Cir. 1998). "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279 (1979); see also E & T Realty, 830 F.2d at 1113. "Purposeful discrimination can be shown by circumstantial evidence. For example, purposeful discrimination can be indirectly proven by a 'stark' pattern of adverse impact on a particular group." E & T Realty, 830 F.2d at 1113 n.9. As the Supreme Court has stated:

45

> Proof of discriminatory intent must necessarily usually
> rely on objective factors, several of which were outlined
> in Arlington Heights v. Metropolitan Housing Dev. Corp.,
> [429 U.S. 252, 266 (1977)]. The inquiry is practical.
> What a legislature or any official entity is "up to" may
> be plain from the results its actions achieve, or the
> results they avoid.  Often it is made clear from what has
> been called, in a different context, "the give and take
> of the situation."

Feeney, 442 U.S. at 279 (quoting Cramer v. United States, 325 U.S.

1, 32-33 (1945)).  The court will first address the City's motion

for summary judgment as to Count I before turning to the motions of

the individual City defendants.

    1.  **The City's Motion for Summary Judgment as to
        Count I**

The City argues that Corey has failed to produce sufficient

evidence to show purposeful discrimination by the City against

Corey and that Corey has failed to produce sufficient evidence that

the City had a custom or policy that constituted deliberate

indifference to Corey's right to equal protection that caused

Corey's injury, both of which are essential to Corey's Section 1983

claim against the City.  Under Section 1983, municipalities may not

be held liable on a theory of respondeat superior.  Snow ex rel.

Snow v. City of Citronelle, 420 F.3d 1262, 1270 (11th Cir. 2005)

(citing City of Canton v. Harris, 489 U.S. 378, 385 (1989)).

Instead, a municipality will be held liable if the plaintiff shows

"(1) that his constitutional rights were violated; (2) that the

municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing Canton, 489 U.S. 378 at 388). Thus, in this case, Corey must first show that the City violated its right to equal protection by treating it differently than similarly situated persons for the purpose of discriminating against it. In addition, Corey must show that the City had a custom or policy that constituted deliberate indifference to Corey's right to equal protection and that this policy or custom caused the violation of Corey's right.

"A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997). "A custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law." Goebert v. Lee County, 510 F.3d 1312, 1332 (11th Cir. 2007) (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988)). "To establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice. Moreover, actual or constructive knowledge of such customs must be attributed to the

governing body of the municipality."  Depew v. City of St. Mary's, Ga., 787 F.2d 1496, 1499 (11th Cir. 1986).

For the purposes of its motion for summary judgment, the City does not significantly challenge whether Corey and Clear Channel were similarly situated as bid proponents.  The City does, however, note its position that Corey and Clear Channel were similarly situated only to the limited extent that both entities were bidding on the Airport advertising contract but that, once Clear Channel was selected as the most responsible and responsive bid proponent, they were no longer similarly situated.  Thus, according to the City, evidence of actions taken after the City had selected Clear Channel cannot establish an equal protection claim.  The court agrees but only to a limited extent.

As the court noted in a previous order, given the allegations Corey has made against the City defendants, "the relevant inquiry should be focused on whether Clear Channel and Corey were similarly situated as corporate entities [persons] bidding on the Airport advertising contract and not on which party was the most experienced or produced the superior financial bid.  Stated differently, the key issue in determining whether Clear Channel and Corey were similarly situated is whether they were sufficiently similarly situated to merit equal and fair consideration as bidders on the airport advertising contract."  July 15, 2005, Order at 21

48

[Doc. No. 79]. Thus, once the City decided to issue the 2002 RFP, all bid proponents who met the amended minimum qualification requirements had a right to have the Procurement and Real Estate Code of the City applied equally so that the terms of the 2002 RFP were fair to all such bid proponents and so that the City treated all such bid proponents equally during the 2002 RFP selection process. The evidence is uncontested the Corey and Clear Channel both met the amended minimum qualification requirements, and, therefore, both were similarly situated and merited equal consideration and treatment.

Once Clear Channel was selected as the most responsible and responsive proponent, then the City is correct in its conclusion that Corey and Clear Channel were no longer similarly situated. As discussed in more detail below, however, once the City did not reach a final agreement with Clear Channel and re-opened negotiations by materially changing the terms of the 2002 RFP, Corey and Clear Channel were once again similarly situated as bid proponents, and the City should have afforded Corey the same opportunity to amend its proposal as it did for Clear Channel. Thus, actions taken after the negotiations between Clear Channel and the City failed to reach a final agreement may give rise to an equal protection claim and provide evidence in support of Corey's equal protection claim based on the conduct of the City prior to

the selection of Clear Channel as the most responsible and responsive bid proponent.

Setting aside, for the moment, the issue of whether Corey and Clear Channel were similarly situated, the City argues that Corey cannot establish that the City had a discriminatory purpose and that Corey cannot establish that the City had a policy or custom that caused a violation of Corey's right to equal protection. The court disagrees. Keeping in mind that the court must view the evidence and all factual inferences in the light most favorable to Corey, the court holds the following.

First, Corey has produced evidence that the structure of the 2002 RFP and the overall administration of the 2002 RFP selection process were biased and manipulated by the City to the benefit of Clear Channel and to the detriment of any non-incumbent bid proponents. For example, Corey has presented evidence that the City drafted the 2002 RFP to favor Clear Channel over any other bid proponent; more thoroughly examined Corey's DBE partner than it did Clear Channel's DBE partner; accepted without question Clear Channel's proposal, even though that proposal was based on a number of sign locations higher than that set forth in the 2002 RFP; and manipulated the scoring of the proposals so that Clear Channel's bid would rank higher than all others. The court holds that a trier of fact could infer from the evidence, presented as a whole

and in context, that the City intended to discriminate against non-incumbent bid proponents, including Corey.

Second, Corey has presented sufficient evidence that the City has an ongoing custom of favoring the private defendants in relation to the Airport advertising contract and that this custom caused a violation of Corey's right to equal protection. For example, in addition to the evidence just mentioned, Corey has presented evidence that the City awarded a no-bid 15-year exclusive contract to TMI of Georgia(which was owned by Fouch and J. Riley and ultimately bought by Clear Channel); extended the original Airport advertising contract for seven years at the original below-market rental rate of 50% before issuing the 2002 RFP; and re-opened negotiations with Clear Channel by changing the terms of the 2002 RFP and allowing Clear Channel to change the terms of its proposal without allowing other proponents, including Corey, to amend their proposals. It is true that much of this evidence, if considered individually and out of context, would perhaps appear innocuous. The court holds, however, that the evidence is such that, when considered in its entirety and in context, the trier of fact could infer that the City had a custom of favoring the incumbent Clear Channel and the other private defendants that constituted deliberate indifference to Corey's right to equal protection and that custom caused a violation of Corey's

constitutional right. Accordingly, the court denies the City's motion for summary judgment as to Count I.

### 2. The Individual City Defendants' Motions for Summary Judgment as to Count I

Owens, Smith, DeCosta, Chavis, and Mastin have filed motions for summary judgment in response to all of Corey's claims against them in their individual capacities on the basis of qualified immunity. The defense of qualified immunity provides "complete protection for government officials sued in their individual capacities as long as 'their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'" Thomas v. Roberts, 261 F.3d 1160, 1170 (11th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (additional quotations omitted)). Given the important public policies underlying the defense of qualified immunity, the Eleventh Circuit has cautioned that "courts should think long and hard before stripping defendants of immunity." Lassiter v. Alabama A&M University, 28 F.3d 1146, 1149 (11th Cir. 1994) (abrogated on other grounds by Hope v. Pelzer, 536 U.S. 730 (2002)); see also Ray v. Foltz, 370 F.3d 1079, 1082 (11th Cir. 2004) (quoting Lassiter for this proposition after Lassiter was abrogated by Hope).

"Because of the purpose served by the doctrine of qualified immunity, a valid defense based upon it must be recognized as soon as possible, preferably at the motion to dismiss or summary judgment stage of the litigation." Johnson v. Breeden, 280 F.3d 1308, 1317 (11th Cir. 2002) (citations omitted). If it is not clear from the allegations in the complaint that the defendants are entitled to qualified immunity, then the case proceeds to the summary judgment stage, which is the "most typical juncture at which defendants entitled to qualified immunity are released from the threat of liability and the burden of further litigation." Id. Nevertheless, not all who are entitled to qualified immunity receive it at the summary judgment stage. Id. Only those defendants who are able to show that there is no genuine issue of material fact that prevents them from being entitled to qualified immunity are entitled to that defense at the summary judgment stage. Id. "But if the evidence at the summary judgment stage, viewed in the light most favorable to the plaintiff, shows there are facts that are inconsistent with qualified immunity being granted, the case and the qualified immunity issue along with it will proceed to trial." Id.

The court must apply a two-part analysis in order to determine whether a defendant government official is entitled to qualified immunity. Harbert International, Inc. v. James, 157 F.3d 1271,

1281 (11th Cir. 1998).  First, the defendant who seeks the benefit
of qualified immunity must "prove that 'he was acting within the
scope of his discretionary authority when the allegedly wrongful
acts occurred.'"  Courson v. McMillian, 939 F.2d 1479, 1487 (11th
Cir. 1991) (quoting Rich v. Dollar, 841 F.2d 1558, 1563 (11th Cir.
1988)).  "If the defendant was not acting within his discretionary
authority, he is ineligible for the benefit of qualified immunity."
Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).

In order to establish that he was acting within the scope of
his discretionary authority, a defendant must show that: (1) he was
"performing a legitimate job-related function (that is, pursuing a
job-related goal)"; and (2) he performed this legitimate job-
related function "through means that were within his power to
utilize."  Hollomon ex rel. Holloman v. Harland, 370 F.3d 1252,
1265 (11th Cir. 2004).  In order to satisfy the first prong, a
defendant must establish that he was "performing a function that,
but for the alleged constitutional infirmity, would have fallen
[within] his legitimate job description."  Holloman, 370 F.3d at
1266.  In order to satisfy the second prong, a defendant must
establish that he executed that job-related function in an
authorized manner.  Id.

If, and only if, the defendant shows that he was acting within
his discretionary authority, the court moves on to the second part

of the analysis, and the burden then shifts to the plaintiff to demonstrate that qualified immunity is inappropriate because the defendant violated clearly established law. Lee, 284 F.3d at 1194; see also Harbert, 157 F.3d at 1281. In Saucier v. Katz, the Supreme Court set forth a two-part test for evaluating whether the plaintiff has met this burden. 533 U.S. 194, 201 (2001); see also Lee, 284 F.3d at 1194. First, the court must ask this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier, 533 U.S. at 201; see also Lee 284 F.3d at 1194. Second, if a constitutional right would have been violated under the plaintiff's version of the facts, the court must then determine "whether the right was clearly established." Id.; see also Lee 284 F.3d at 1194. In this case, Corey alleges that the individual City defendants each violated its clearly established constitutional right to equal protection by unequally treating Corey in the 2002 RFP process.

### a. Whether Each Individual City Defendant was Acting Within His or Her Discretionary Authority

The court finds that each of the individual defendants was acting within his or her discretionary authority when he or she engaged in the allegedly unlawful conduct. The Eleventh Circuit has held, in determining whether an official has acted within her

discretionary authority, the relevant "inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act." <u>Harbert</u>, 157 F.3d at 1282. "'Instead, a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties. The scope of immunity should be determined by the relation of the [injury] complained of to the duties entrusted to the officer.'" <u>Id.</u> (quoting <u>In re Allen</u>, 106 F.3d 582, 594 (4th Cir. 1997) (additional internal quotation omitted)). Each of the individual defendants' conduct was, at a minimum, reasonably related to his or her discretionary duties. Although the individual City defendants did not have the authority to violate the constitutional rights of Corey and other bid proponents, they did have the responsibility of administering their job duties in relation to the 2002 RFP. Though each may have done so in an unconstitutional manner, that does not change the fact that each was fulfilling a legitimate job-related function. <u>See</u> <u>Holloman</u>, 370 F.3d at 1267. Thus, though Corey argues otherwise, the court finds that each individual City defendant was performing a function that, but for the alleged constitutional infirmity, would have fallen within his or her job function and that each individual defendant executed that job function in an authorized manner.

Having held that each of the defendants was acting within his or her discretionary authority, the court must next apply the Saucier test. Thus, the court must first determine whether each individual City defendant's alleged conduct violated a constitutional right of Corey. If the alleged conduct did violate a constitutional right, the court must then determine whether that right was clearly established.

### b. Whether the Individual City Defendants Each Violated a Constitutional Right of Corey

As the court held with regard to Corey's Section 1983 claim against the City, Corey has presented evidence that creates genuine issues of material fact as to whether the City had a discriminatory intent when administering the 2002 RFP selection process, whether the City had a long-standing custom of favoring the private defendants to the detriment of other potential Airport advertising management companies, and whether this custom directly caused the deprivation of Corey's right to equal protection. In this context and taking the evidence in the light most favorable to Corey, the alleged conduct of each individual defendant shows that he or she participated in and contributed to the deprivation of Corey's right to equal protection by treating Corey unequally and intentionally discriminating against Corey.

The court notes that the parties have presented a voluminous evidentiary record. Since the court is ruling on motions for summary judgment, the court will not address all of the evidence cited by the parties. Instead, in this order the court will address only the evidence that is sufficient for ruling on the motions. The parties should not assume that the court has ruled either way on the relevance or admissibility of any evidence that it does not discuss in this order. The court will now examine each individual City defendant, his or her individual role in the 2002 RFP selection process, and whether his or her alleged conduct violated Corey's right to equal protection.

### i. Ben DeCosta

In 1998, Angela Gittens, the Airport General Manager at the time, authorized and released an RFP that reduced the number of advertising locations in the Airport from approximately 300 to approximately 100. The 1998 RFP was withdrawn that same year prior to any bids or proposals being offered, and Ben DeCosta was hired in 1998 to replace Gittens as the Airport General Manager.

DeCosta knew Fouch and J. Riley from when he worked at the Newark Airport. J. Riley and Fouch's company bid on the advertising contract for the Newark Airport in the early 1990s and offered a 68% rental rate in their bid, and DeCosta testifies that he remembers the 68% rental rate that Riley and Fouch's company

offered.  Clear Channel's records indicate that it paid a rental rate of 72.7% of gross receipts at the Newark Airport from 1998-2002.  Clear Channel's contract for the advertising at the Airport that was in effect when DeCosta became the Airport General Manager provided for a rental rate of 50%.

As the Airport General Manager, DeCosta had the authority to issue a new RFP, but he did not do so until 2002, nearly four years after he became the General Manager.  In addition, DeCosta was responsible for presenting the legislation for the new contract to the City Council for approval, but he did not do so until November 4, 2004, which was two years after Clear Channel was chosen as the most responsible and responsive proponent.  DeCosta argues that he decided not to submit the legislation sooner because of Corey's protest, which the City had done in the past in the face of protests.  Corey filed its lawsuit on November 4, 2004, three days after DeCosta submitted the legislation to the City Council. According to DeCosta, Corey filed its suit before the City Council Transportation Committee met to consider the legislation, and, due to the pending lawsuit, the City Council held the legislation and ultimately filed it pending the outcome of Corey's lawsuit.

On December 14, 2004, Clear Channel sent a letter to Kyle Mastin, the Concession Manager for the Airport, requesting approval to replace the existing advertising displays at the Airport.

DeCosta responded to this request in a letter dated January 20, 2005, and addressed to J. Riley. In that letter, Decosta stated, "As no contract has been awarded pursuant to the RFP, the rights and obligations of the City and Clear Channel regarding advertising at the Airport remain the same." Ex. 102 to Plaintiff's Statement of Facts. DeCosta also stated that the 1995 Airport Advertising Contract continued to be in effect. DeCosta approved Clear Channel's request but stated, "[I]f Clear Channel seeks to replace the existing advertising displays with new displays, it undertakes these actions on its own initiative and without consideration, promise, or any obligation whatsoever being undertaken by the City or the Airport." Id.

Even though he claimed that the 1995 Airport Advertising Contract governed, DeCosta contacted J. Riley in early 2005 and told him that Clear Channel should begin paying the higher rental rate of 61.1% that Clear Channel had proposed in its original response to the 2002 RFP. As a result, DeCosta believed that he and J. Riley had reached a verbal agreement that Clear Channel would pay the higher rental rate going back to January 1, 2005. In late 2006, DeCosta learned that Clear Channel had not been paying the increased rent. DeCosta then contacted Clear Channel and explained that he expected Clear Channel to pay the increased rent in accordance with the verbal agreement he had with J. Riley, to

pay the difference between the 50% rate and the 61.1% rate back to January 1, 2005, and to pay interest on the back rent that was past due. DeCosta also informed Clear Channel that if it failed to honor the verbal agreement, he would prepare and release a new RFP.

In May 2006, DeCosta increased his demand from the 61.1% that Clear Channel had proposed in its bid to 61.2%. In addition, Clear Channel began to negotiate with the City for new sign locations in the Airport. In a letter from Samuel Hart of Clear Channel to Mastin dated May 3, 2006, Clear Channel stated that it felt that "further action" was needed by the City in relation to the proposal to replace the existing advertising displays and to pay the retroactive increased rental rate. Ex. 61 to Plaintiff's Statement of Facts. Clear Channel then stated that it would "require the following assurances and/or agreements by the city to complete the proposal," which included the City's agreement to approve new display locations. Id. On December 1, 2006, Clear Channel wrote a check to the City of Atlanta for approximately $1.7 million referencing the "back rent calculation of City of Atlanta Airport". In the letter accompanying the check (dated December 4, 2006), M. Riley stated, "The Airport has consented to [Clear Channel's] proposed replacement of its existing advertising display inventory and installation of certain new display inventory. Also, [Clear Channel] agrees with the Airport to pay a higher rental payment of

61

61.2% during the time of its current operations at the Airport."
Ex. 64 to the Plaintiff's Statement of Facts. M. Riley went on to
state in the letter, "In consideration for the new display
advertising locations at the Airport, [Clear Channel] will pay the
Airport a one-time up front payment of $1,739,650.00." Id.

Corey argues that DeCosta did not have the authority to amend
the 1995 Airport Advertising Contract because any such amendment
had to be executed by the Chief Procurement Officer and presented
to and adopted by the City Council. Thus, according to Corey,
these ongoing negotiations were in relation to the 2002 RFP and
were therefore in violation of the Procurement and Real Estate Code
of the City and Section 1.7 of the 2002 RFP, in that, Corey should
have been offered an opportunity to take part in these negotiations
as a bid proponent in the 2002 RFP process. Section 2-1189(f) of
the City Procurement Code, which governs competitive sealed
proposals, states in relevant part, "Offerors shall be accorded
fair and equal treatment with respect to any opportunity for
discussion and revision of proposals, and such revisions may be
permitted after submissions and prior to award for the purpose of
obtaining the best and final offers." Corey argues that, since a
final agreement was never reached between the City and Clear
Channel, the contract has yet to be awarded. In addition Corey
argues that, during these negotiations, the City changed the terms

of the 2002 RFP by allowing additional advertising display locations and that the City allowed Clear Channel to revise its proposal. Thus, according to Corey, the City unequally applied Section 2-1189(f) by allowing Clear Channel an opportunity to revise its proposal after submission without allowing Corey to revise its proposal based on the increased number of sign locations.

Section 1.7 of the 2002 RFP provides that the City will enter into negotiations with the winning bid proponent in order to reach a final agreement. Section 1.7 further provides that, if no agreement is reached, then the City will terminate the negotiations and turn to the next highest ranking bid proponent, which, in this case, would be Corey. According to Corey, the initial negotiations between Clear Channel and the City occurred in 2002, and these negotiations did not result in a final contract. Therefore, according to Corey, the City should have entered into negotiations with Corey rather than change the terms of the 2002 RFP and re-open negotiations with Clear Channel.

DeCosta does not contend that he had the authority to amend the 1995 Airport Advertising Contract, nor does he contest that the City would have been obligated to include Corey in any renewed negotiations with regard to a change in the terms of the 2002 RFP. Instead, DeCosta argues that the discussions that he and the City

63

had with Clear Channel were in its capacity as the existing concessionaire and that is why the City did not include Corey. DeCosta argues that, under the terms of the 1995 Airport Advertising Contract, Clear Channel could replace or add advertising displays so long as the City approved. Furthermore, DeCosta argues that Clear Channel's decision to pay a higher rental rate and replace the existing displays did not obligate the City to anything and therefore did not constitute an amendment to the 1995 Airport Advertising Contract. The court disagrees with DeCosta's reasoning.

It is true that the verbal agreement that DeCosta reached with M. Riley and the ultimate agreement that DeCosta reached with Clear Channel regarding the increased rental rate and payment of back rent did not obligate the City, but this is only because DeCosta did not have the authority to amend the 1995 Airport Advertising Contract. If, but only if, DeCosta had possessed the authority to amend the existing agreement, then these agreements would have obligated the City (and Clear Channel for that matter) because the City would have been required to keep in place the existing contract (even if just as a month-to-month contract) under the new terms, i.e., Clear Channel paying an increased rental rate (applied retroactively) in exchange for the City's agreement to allow Clear

Channel to increase the number of display locations in the Airport (among other things).

First, DeCosta stated that, if Clear Channel did not honor its verbal agreement with DeCosta, then he would issue a new RFP. The thinly veiled implication of this offer is that, if Clear Channel did make payment of the back rent and agreed to the increase in the rental rate, then DeCosta would continue the 1995 Airport Advertising Contract at the increased rate until Clear Channel was awarded a new contract as the winning bid proponent. This view is supported by the fact that, when Clear Channel agreed to DeCosta's demand and made payment, DeCosta did not cancel the existing contract and release a new RFP. Instead, Clear Channel continued as the existing concessionaire at the increased rental rate.

Second, the letter from Hart to Mastin shows that Clear Channel intended to require that the City agree to certain things (including an increase in display locations) in exchange for the payment of the retroactive increased rental rate, including the payment of the lump sum for back rent past due. Though the 1995 Airport Advertising Contract provided that the existing concessionaire could increase the number of advertising displays in the Airport with the City's approval, Clear Channel was proposing that the City approve new signs in exchange for the payment of

approximately $1.7 million, which would constitute an amendment to the 1995 Airport Advertising Contract.

Third, the letter from M. Riley that accompanied the check indicates that the $1.7 million was payment in consideration of the new advertising display locations. The City's acceptance of the check indicates that the City agreed that it was payment in consideration of the additional display locations. Therefore, the City would have been obligated to allow Clear Channel to increase the number of advertising displays in the Airport, even though the City would have retained the power to cancel the existing month-to-month contract.

This evidence supports the conclusion that if DeCosta had possessed the authority to amend the existing contract, then the agreement with Clear Channel would have obligated the City by amending the terms of the existing contract. If DeCosta did not have the authority to amend the existing contract, then, of course, the City would not be obligated. Since DeCosta did not have the authority to amend the 1995 Airport Advertising Contract, the agreement that DeCosta reached with Clear Channel did not obligate the City. Furthermore, DeCosta knew or should have known that he did not have the authority to amend the 1995 Airport Advertising Contract. For this reason, DeCosta knew or should have known that the negotiations with Clear Channel were not in its capacity as the

existing concessionaire and were not related to the existing contract. Instead, it appears that DeCosta was negotiating with Clear Channel in its capacity as a bid proponent. This conclusion is supported by the fact that DeCosta initially demanded that Clear Channel begin paying the rental rate that it had offered in its bid proposal. Thus, it seems that DeCosta was attempting to renegotiate the terms of the 2002 RFP with Clear Channel and to cause Clear Channel to start complying with the terms of its amended proposal before a contract was awarded. But if DeCosta was negotiating with Clear Channel in its capacity as a bid proponent, then he should have given Corey the same opportunity to amend its proposal based on the additional sign locations.

It is evident that the initial negotiations with Clear Channel did not result in a final contract. In addition, it seems that this failure can be attributed (if not entirely, then in part) to Corey's protest and its lawsuit. DeCosta's own testimony, however, indicates that the City could have cancelled the 2002 RFP, issued a new RFP, and awarded a new contract during this time, given that he told Clear Channel that he would issue a new RFP if it did not comply with his verbal agreement with M. Riley. Thus, DeCosta could have refrained from turning to Corey as the next highest bid proponent on the grounds that a final contract could not be reached until the completion of the protest and litigation, but once

DeCosta changed the terms of the 2002 RFP and allowed Clear Channel to amend its proposal, DeCosta should have allowed Corey an equal opportunity to amend its bid proposal. Thus, taking the evidence in the light most favorable to Corey, the court concludes that DeCosta violated Corey's right to equal protection by treating Corey unequally in the 2002 RFP selection process and intentionally discriminating against Corey.

### ii. Kyle Mastin

Kyle Mastin is the Concession Manager for the Airport, and he served in that capacity when the 2002 RFP was issued. Mastin and Marlene Coleman drafted Part III (the technical portion) of the 2002 RFP, which included the 31-Day MAG Provision. Mastin also served as one of the scoring evaluators of the proposals submitted in response to the 2002 RFP. In addition, Mastin represented the City in its negotiations with Clear Channel on November 14, 2002, and, as discussed in relation to DeCosta's motion for summary judgment, Mastin was also involved in the negotiations between the City and Clear Channel beginning at the end of 2004 that ultimately resulted in Clear Channel agreeing to pay a retroactive increased rental rate in exchange for additional advertising display locations.

According to Corey, Mastin drafted the technical portion of the 2002 RFP so as to favor Clear Channel over all other potential

bid proponents and that this bias evidences a discriminatory intent in favor of Clear Channel and against all other prospective bid proponents, including Corey.  In addition, Corey argues that Mastin manipulated the scoring of the bid proposals to the benefit of Clear Channel.  In support of its claims, Corey has produced the testimony of Brett Katzman, who is an expert in competitive bidding in the procurement setting.

With regard to the alleged bias built into the 2002 RFP, Corey objects in particular to the 31-Day MAG Provision.  The MAG is the minimum rent that the winning proponent would have to pay.  The MAG is calculated by multiplying the proponent's proposed rental rate percentage of its gross receipts by 85% of the proponent's projected gross receipts.  The 31-Day MAG provision requires the successful proponent to begin monthly rental payments 31 days after an agreement is reached.  At that point, the winning proponent would be required to pay the higher of one-twelfth of the MAG per month or its proposed percentage of gross monthly receipts as rent. Katzman opines that the 31-Day MAG provision clearly favored Clear Channel as the incumbent and disadvantaged all non-incumbent bid proponents.

For example, Katzman states that the 31-Day MAG provision provides a substantial benefit to Clear Channel as the incumbent concessionaire because, if Clear Channel ultimately won the bid, it

would not be required to pay rent during the first 31 days it had the contract, but it would receive revenue from the existing advertising. Thus, Clear Channel would receive a 31-day rent free period worth approximately $842,000.

In addition, Katzman states that the 31-Day MAG provision created uncertainty for non-incumbent bid proponents and forced them to take into consideration financial risks that Clear Channel did not have to face. Katzman notes as an example that, if a non-incumbent were selected as the most responsible and responsive bid proponent and was awarded the contract, it would then have to submit its plans for its displays, submit possible questions and possible new or revised plans in light of the City's response, wait for the City's final approval, fabricate the new displays, and then install those displays. This process would delay the non-incumbent from generating revenue with which to pay the MAG after the 31-day rent free period. Katzman notes that one possible option available to a non-incumbent would be to proceed with those steps during the approximate 60 days between the selection of the non-incumbent and the execution of the contract by the Mayor. But Katzman states that the design and fabrication of new signs would involve an investment of over $2 million, and, therefore a non-incumbent firm would incur a great financial risk if it undertook these steps before having an executed contract. In addition, Katzman notes

that proponents selected in past RFPs have never received contracts from the City. Thus, according to Katzman, the 31-Day MAG provision evidences that bias in favor of Clear Channel was built into the technical portion of the 2002 RFP, which was drafted by Mastin.

Furthermore, Katzman testifies that various steps could have been taken to alleviate this bias, but the City failed to do so. For example, the City could have bought the existing displays from Clear Channel under the terms of the existing contract and then sold them at cost to a non-incumbent. But the City did not commit to doing so and did not communicate to the non-incumbents that it would make such a commitment. In addition, Corey asked the City to consider extending Clear Channel's existing contract for 60 days to allow a new concessionaire time to build the necessary equipment, and the City responded simply with a "No." Ex. 22 to Plaintiff's Statement of Facts at Addendum 4.

Next, Corey claims that Mastin manipulated the scoring of the proposals in favor of Clear Channel. According to Corey, Clear Channel presented inflated revenue projections that were based on additional advertising display locations that were not disclosed in the 2002 RFP, yet Mastin scored Clear Channel based on these inflated revenue projections. In support of its claim, Corey points out that both J. Riley and M. Riley testify in their

depositions that Clear Channel's proposal was based on Clear Channel's assumption that it would be able to increase the number of display locations beyond the number set forth in the 2002 RFP. In addition, Corey points out that Clear Channel's revenue projections went from approximately $10 million in the first year to approximately $20 million in the fifth year. The subsequent negotiations between the City (by DeCosta and Mastin) and Clear Channel that resulted in Clear Channel increasing its rental rate to 61.2% in exchange for an increase in the number of display locations further supports Corey's claim that Clear Channel's revenue projections were based on more advertising locations than what was set forth in the 2002 RFP. According to Corey, since he was the Concession Manager and drafted the technical portion of the 2002 RFP, Mastin knew the number of display locations that were identified in the 2002 RFP and knew the revenue that those signs generated in the five years prior to the release of the 2002 RFP, which was significantly lower than Clear Channel's projected revenue. Nevertheless, Mastin never questioned those projections and based his score on those inflated projections. Corey argues that, in doing so, Mastin gave Clear Channel an unfair advantage in the scoring process.

In addition, Katzman testifies that the scoring system employed in scoring the proposals was susceptible to manipulation.

As the court noted previously, the proposals were scored according to the following categories (points available are in parentheses): General and Specialized Experience (10 points); Past Performance and Experience (10 points); Performance Capabilities (10 points); Business Plan (10 points); Fee (35 points); Financial Condition (10 points); and Equal Business Opportunity (awarded for partnering with a DBE) (15 points). According to Katzman, an evaluator could manipulate the scoring by giving a slightly higher score in the objective Fee category (worth 35% of the total score) to a proponent who offered a higher rental rate, while at the same time negating that reward by giving another proponent substantially higher scores in the more subjective categories, each of which were worth less of the total (10% each) but collectively worth more (40%). Katzman states that Mastin's scoring indicates that he engaged in just this practice.

Mastin scored Corey 5 points higher on the Fee category but awarded Clear Channel 5 more points than Corey in Past Performance and Experience. Thus, according to Katzman, Mastin used a category worth only 10% of the total to negate Corey's advantage in a category worth 35% of the total. In Katzman's opinion, this scoring indicates that Mastin manipulated the scoring of Clear Channel and Corey's proposals. Taking this evidence and all factual inferences in the light most favorable to Corey, the court

holds that Mastin treated Corey and Clear Channel unequally and intentionally discriminated against Corey during the 2002 RFP Process, and, by doing so, Mastin violated Corey's right to equal protection.

### iii. Hubert Owens

Owens is the Director of the City's Office of Contract Compliance ("OCC") and served in that capacity when Fouch submitted her DBE application in late May 2002, and he oversaw and gave final approval of Fouch's DBE application. Corey alleges that Owens intentionally discriminated against Corey by certifying Fouch d/b/a CMDG as a DBE so that Clear Channel would receive 15 points on its proposal for partnering with a DBE.

In support of its claims, Corey notes that Owens began working in the OCC in 1994 as a contract compliance specialist. Owens acknowledges that, during his time with the OCC prior to Fouch applying for DBE certification, he knew that Fouch had been involved with the advertising contract at the Airport. In addition, Corey points out, among other things, that its DBE partner, Maureen Malone, doing business as Sydney Baxter & Co., was more thoroughly investigated and reviewed by Owens and his office than was Fouch. In fact, the DBE certification recommendation form for Fouch that Owens approved was only partially completed.

Notably, the questions relating to Fouch's gross revenue and net worth were left incomplete.

As the Director of OCC, Owens reviewed the proposals submitted by Corey and Clear Channel in order to determine whether they were responsive to the DBE requirements. Based on his approval and certification of both Fouch and Malone, Owens deemed both Clear Channel and Corey to have complied with the DBE requirements, which resulted in both companies receiving the full 15 points on the scores of their respective proposals. Corey argues that, had Owens and his office more thoroughly vetted Fouch, as they did Corey's DBE partner, he would not have certified her as a DBE, Clear Channel would not have received the 15 points, and Corey's score would have been higher than Clear Channel's. Taking the evidence and all factual inferences in the light most favorable to Corey, the court finds that Owen's alleged conduct deprived Corey of its right to equal protection by treating Corey differently than Clear Channel and intentionally discriminating against Corey in the DBE certification process and the scoring process.

### iv. Adam Smith

Smith is the Chief Procurement Officer of the City. He took office in January, 2003, two months after the City selected Clear Channel as the top-ranked proponent for the Airport advertising contract. As such, Smith had no involvement in the DBE

certification process or in the 2002 RFP process prior to the initial selection of Clear Channel as the most responsible and responsive proponent. By the time he took office, Corey had filed its protest with the City regarding the selection of Clear Channel as the top-ranked bid proponent. Furthermore, prior to his taking office, Smith's predecessor, Felicia Strong-Whitaker, had denied Corey's protest and Corey had filed its appeal of that denial. Nevertheless, Corey alleges that Smith purposefully discriminated against it because he subsequently did not launch an independent investigation of Corey's claims. In support of its claim, Corey cites a letter that it obtained through discovery that indicates it is from Smith to M. Riley (though it does not contain Smith's handwritten signature). The letter also indicates that copies were sent to seven other people, including DeCosta and Owens. The letter states, in relevant part:

> After careful review of the procurement file on the above-referenced project [the 2002 RFP], the Department of Procurement has concluded that the City did not follow the established procurement process in such a manner as to serve the best interests of the City. More specifically, we determined that the evaluation of the minimum qualifications for each proponent was not properly conducted.

> In light of this factor, the City has determined that it would be in its best interest to cancel the solicitation, reject all proposals and re-solicit for this project.

Ex. 56 to Plaintiff's Statement of Facts. In his deposition, Smith denied having any knowledge of the letter. Regardless, taking this evidence and all factual inferences in the light most favorable to Corey, this letter indicates that Smith determined that the 2002 RFP was conducted improperly, but then refused to cancel the bid and issue a new RFP, which was within his authority and which he had done in other cases. If he did so, Smith treated Corey unequally and discriminated against it in order to favor Clear Channel. Thus, Smith's alleged conduct deprived Corey of its right to equal protection.

### v.    Carolyn Chavis

In 2002, Chavis was the City's Aviation Contract Administrator, and she drafted Parts I and II of the Airport Advertising RFP, which were the non-technical portions. Chavis was also the City's Contact Person for the 2002 RFP, and, in this capacity, she responded to inquiries submitted by bid proponents. In particular, Chavis accepted written questions from the bid proponents, directed those questions to the appropriate department or agency, and ensured that written responses would be provided to the bid proponents and that those responses were attached to the 2002 RFP as an addendum.

Corey sent three sets of questions to Chavis. The first two were answered and attached to the 2002 RFP in Addendum Four. The

third set, however, was never answered and was never attached to the 2002 RFP. Chavis, however, responded to all inquiries made by Clear Channel. In her deposition, Chavis testifies that it was a mistake that the third set of questions was not answered. This may be the case, but just because Chavis says that it was a mistake does not make it so. Chavis also testifies that she retired from her position early in 2007, but her boss, Adam Smith, states in his deposition that he terminated her. Perhaps she retired; perhaps she was terminated. Perhaps she made an innocent mistake in failing to ensure that the third set of questions was answered and attached to the 2002 RFP; perhaps she refused to answer as part of an overall plan to discriminate against Corey in the 2002 RFP selection process. The court cannot decide this issue at the summary judgment stage. Thus, taking the evidence and all factual allegations and inferences in the light most favorable to Corey, the court holds that Chavis treated Corey unequally in relation to Clear Channel in responding to written questions and intentionally discriminated against Corey. Therefore, Chavis's alleged conduct, when taken in context, violated Corey's right to equal protection.

In summary, taking the evidence and all factual inferences in context and in the light most favorable to Corey, the court holds that each individual defendant's conduct, as alleged, violated

Corey's right to equal protection.  The next issue is whether the
constitutional right at issue was clearly established.

### c.    Whether the Right was Clearly Established

The individual city defendants argue that Corey cannot meet
its burden by arguing that the clearly established right is the
right to equal protection.  In support of this proposition, DeCosta
states in a footnote in his brief, "The Eleventh Circuit has
previously stated that the 'most common error' it finds on
qualified immunity appeals is where district courts 'permit
plaintiffs to discharge their burden by referring to general rules
and to the violation of abstract rights.'"  Brief in Support of Ben
DeCosta's Motion for Summary Judgment at 14 n.5 (quoting Lassiter,
28 F.3d at 1150 and stating that Lassiter was "abrogated on other
grounds" by Hope, 536 U.S. at 730).[2]  The defendants go on to quote
a case in which the Eleventh Circuit stated that it "has held time
and time again that clearly established general principles of law
will seldom if ever suffice to strip a defendant of qualified
immunity."  Harbert, 157 F.3d at 1284.  But Harbert predates Hope,
and the Eleventh Circuit itself has noted that the Supreme Court in
Hope "cautioned that we should not be unduly rigid in requiring
factual similarity between prior cases and the case under

---

[2]The court notes that each of the individual City defendants
has the same quote in a footnote in his or her brief.

consideration." <u>Vaughan v. Cox</u>, 343 F.3d 1323, 1332 (11th Cir. 2003) (citing <u>Hope</u>, 536 U.S. at 741).[3]

In <u>Hope</u>, the Supreme Court held:

> For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, <u>see Mitchell v. Forsyth</u>, 472 U.S. 511, 535, n. 12; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.' <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987).

<u>Hope</u>, 536 U.S. at 741. The Supreme Court then explained that "'general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful.'" <u>Hope</u>, 536 U.S. at 741 (quoting <u>United States v. Lanier</u>, 520 U.S. 259, 270 (1997) (other internal quotations omitted)). The Supreme Court ultimately held in <u>Hope</u> that "the salient question" that the court must answer "is whether the state of the law" at the time of the alleged conduct gave the government officials "fair warning that their alleged treatment [of the

---

[3]The Eleventh Circuit has also noted that the Supreme Court in <u>Hope</u> "chastised" it "for taking an unwarrantedly narrow view of the circumstances in which public officials can be held responsible for their constitutional violations." <u>Holloman</u>, 370 F.3d at 1276.

plaintiff] was unconstitutional." 536 U.S. at 741; <u>see also</u> <u>Vaughn</u>, 343 F.3d at 1332.

In response to the Supreme Court's holding, the Eleventh Circuit has held it does "not just compare the facts of an instant case to prior cases to determine if a right is 'clearly established;' we also assess whether the facts of the instant case fall within statements of general principle from our precedents." <u>Holloman</u>, 370 F.3d at 1278. Thus, there need not be cases with facts that are materially similar to the facts of this case in order for the constitutional right at issue to be clearly established. Instead, the state of the law must be such that the individual City defendants had fair warning that their alleged treatment of Corey was unconstitutional.

Relevant to this case, the Eleventh Circuit has held, "It is well settled that unequal application of a facially neutral statute may violate the Equal Protection Clause." <u>Strickland</u>, 74 F.3d at 264 (citing <u>Eide v. Sarasota County</u>, 908 F.2d 716, 722 (11th Cir. 1990) and <u>Mackenzie v. City of Rockledge</u>, 920 F.2d 1554, 1559 (11th Cir. 1991)). Though there was no Eleventh Circuit case law in 2002 with facts that are materially identical to those at hand, such case law was not necessary to give the individual City defendants fair notice that their alleged conduct would violate Corey's constitutional rights. Any reasonable government official would

know that he or she must administer his or her duties in a fair-handed and equal manner with regard to similarly situated persons. Any reasonable government official would know that, if he or she participated in a plan and custom of favoring one person and intentionally discriminating against other similarly situated persons, then he or she would be violating the constitutional rights of those discriminated against. Finally, any reasonable government official involved in the 2002 RFP process would know that, once the RFP was issued, they had to treat all similarly situated bid proponents fairly and equally in scoring the proposals and awarding the highest-ranked proponent the contract. Accordingly, the court holds that the individual City defendants had fair notice that their alleged conduct and treatment of Corey would be unconstitutional. Therefore, the constitutional right that Corey alleges was violated by the individual City defendants was clearly established as of the time the conduct took place.

In summary, taking the evidence in the light most favorable to Corey, the court holds that, though they were acting within their discretionary authority, the individual City defendants each violated Corey's clearly established constitutional right to be treated fairly and equally during the 2002 RFP process. Accordingly, the individual City defendants are not entitled to the defense of qualified immunity at this stage of the litigation.

Therefore, the court denies their respective motions for summary judgment.

**B.   Count II:  Conspiracy to Violate Equal Protection**

In Count II, Corey alleges that the City defendants and the private defendants conspired to violate Corey's right to equal protection.   The court first notes that it has found that the individual City defendants are not entitled to the defense of qualified immunity at this point.   In addition, the Eleventh Circuit has held "[P]rivate defendants can be held liable in a § 1983 action if they act in concert with the state officials in depriving a plaintiff of constitutional rights."   Bendiburg v. Dempsey, 909 F.2d 463, 468 (11th Cir. 1990)  (citing Lugar v. Edmondson Oil Co., 457 U.S. 922 (1987) and Dennis v. Sparks, 449 U.S. 24 (1980)).  As a threshold matter, a plaintiff must "show an underlying actual denial of its constitutional rights" in order to prevail on a Section 1983 conspiracy claim.   GJR Investments, Inc. v. County of Escambia, Florida, 132 F.3d 1359, 1370 (11th Cir. 1998).  A plaintiff must then "show that the parties 'reached an understanding' to deny the plaintiff his or her rights." N.A.A.C.P. v. Hunt, 891 F.2d 1555, 1563 (11th Cir. 1990); see also Bendiburg, 909 F.2d at 468.  "The conspiratorial acts must impinge upon the federal right; the plaintiff must prove an actionable wrong to support the conspiracy."  Id.; see also Bendiburg, 909

F.2d at 468. "The plaintiff does not have to produce a 'smoking gun' to establish the 'understanding' or 'willful participation' required to show a conspiracy but must show some evidence of agreement between the defendants." Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1284 (11th Cir. 2002) (quoting Bendiburg, 909 F.2d at 469 and citing Bailey v. Board of County Commissioners of Alachua County, 956 F.2d 1112, 1122 (11th Cir. 1992)).

As the court has already held, Corey has presented evidence from which the trier of fact could conclude that there has been an actual denial of Corey's constitutional right to equal protection. Accordingly, the court must now address whether Corey has presented sufficient evidence for establishing that the City defendants and the private defendants reached an understanding to deny or willfully participated in denying Corey's constitutional right.

The Eleventh Circuit has stated "[T]he linchpin for conspiracy is agreement, which presupposes communication . . . ." Bailey, 956 F.2d at 1122. It is not contested that the private defendants communicated with the City and the various individual City defendants in the years leading up to the release of the 2002 RFP and during the various negotiations that took place over the years following the release of the 2002 RFP, and, therefore, the private defendants had the opportunity to conspire with the City

defendants. All of the private defendants, however, argue that the various communications were legitimate and are not evidence of a conspiracy to deny Corey of its right to equal protection. Thus, according to the private defendants, they are entitled to summary judgment. The court disagrees.

There is evidence in the record from which the trier of fact could find that the private defendants reached an understanding with the City to favor Clear Channel over all other similarly situated bid proponents and that they willfully participated in this conspiracy. If this is the case, then the private defendants have acted in concert with the City defendants in such a way as to subject them to liability under Section 1983. For example, there is evidence that the private defendants were in contact with the City prior to the release of the 2002 RFP. There is evidence that Clear Channel submitted inflated revenue projections in its proposal based on additional display locations that were not included in the 2002 RFP, though Clear Channel did not indicate in its proposal that it was basing its revenue projections on the assumption that the City would approve such an increase. Also, there is evidence that the advertising revenue in the immediate years preceding the release of the 2002 RFP indicated that Clear Channel's projections were inflated but that the City accepted Clear Channel's projections without question. There is evidence

that Clear Channel was ultimately selected as the most responsible and responsive proponent based in significant part on those inflated revenue projections. There is evidence that Clear Channel agreed to pay an increased rental rate retroactively in exchange for the City's approval of additional sign locations, even though no contract had yet been awarded and DeCosta and Mastin did not have the authority to amend the existing contract. Finally, there is evidence that the various private defendants were in communication with the City throughout all of these occurrences. Taking this evidence in its entirety, the trier of fact could find that there was an agreement between the private defendants and the City defendants to act in concert to purposefully discriminate against non-incumbent bid proponents, including Corey, thereby depriving them of their constitutional right to equal protection.

Of course, it is also true that the trier of fact might ultimately conclude that all of the communications between the private defendants and City defendants were innocent and for legitimate purposes and that the evidence does not support a finding of a conspiracy to violate Corey's constitutional right. This cannot be decided at summary judgment, however, because there remain material factual disputes, which, if the trier of fact resolves in favor of Corey, would entitle it to prevail on its

conspiracy claim.  Accordingly, the court denies the defendants'
motions for summary judgment as to Count II of Corey's complaint.

###    C.    Count III:  Attorney Fees Pursuant to 42 U.S.C. § 1988(b)

In Count III, Corey brings a claim for attorney fees and
expenses under 42 U.S.C. § 1988(b), which provides, in relevant
part, "In any action or proceeding to enforce a provision of [42
U.S.C. § 1983], the court, in its discretion, may allow the
prevailing party, other than the United States, a reasonable
attorney's fee as part of the costs . . . ."  Both plaintiffs and
defendants may be prevailing parties for purposes of Section
1988(b), but the standard for determining whether a defendant is a
prevailing party is much more stringent than that for a plaintiff.
Under the Supreme Court's "generous formulation of the term,
plaintiffs may be considered prevailing parties for attorney's fee
purposes if they succeed on any significant issue in litigation
which achieves some of the benefit the parties sought in bringing
suit."  Farrar v. Hobby, 506 U.S. 103, 109 (1992).  For a defendant
to be judged a prevailing party and awarded attorney fees, however,
the Supreme Court has held, "The plaintiff's action must be
meritless in the sense that it is groundless or without foundation.
The fact that a plaintiff may ultimately lose his case is not in
itself a sufficient justification for the assessment of fees."
Hughes v. Rowe, 449 U.S. 5, 14 (1980).  Regardless, because the

court has denied the defendants' motions for summary judgment as to Corey's Section 1983 claims, Corey could still yet prevail on those claims and be entitled to attorney fees. Accordingly, the court denies the defendants' motions for summary judgment as to Count III.

**D.    Counts IV and V:    Conspiracy in Restraint of Trade, Monopolization, Attempted Monopolization, and Conspiracy to Monopolize**

In Counts IV and V of its Second Amended Complaint, Corey sets forth four antitrust claims against the private defendants under Sections One and Two of the Sherman Act, including (1) conspiracy in restraint of trade, (2) monopolization, (3) attempted monopolization, and (4) conspiracy to monopolize. The private defendants argue they are entitled to summary judgment with regard to those claims on the grounds that Corey lacks antitrust standing and Corey has failed to establish the relevant market for those claims. In addition, the private defendants have filed a motion to exclude the testimony of John H. Landon, Ph.D., the expert witness retained by Corey to define the relevant market and to determine whether there was harm to competition within the relevant market. The court will begin with the private defendants' motion to exclude.

**1.    The Motion to Exclude Testimony of John H. Landon [Doc. No. 496]**

In Section II(A)(I) of this order, the court set forth the Daubert standard for evaluating proffered expert testimony. The court will now apply that standard to the expert testimony of Landon.

### a.    Whether the Expert is Qualified

As Corey notes in its brief, the private defendants do not challenge Landon's qualifications to testify. Landon received his B.A. degree in economics with highest honors from Michigan State University and both his Master's and Doctoral degrees in economics from Cornell University. He has served on the faculties of Case Western Reserve University and the University of Delaware, where he has taught both undergraduate and graduate courses in economics. He has held various professional positions related to his expertise in economics, and he has published widely in the field. Given his expertise in economics and that the private defendants have not challenged his qualifications, the court finds that Landon is qualified to testify as an expert witness.

### b.    Whether the Expert has Employed a Sufficiently Reliable Methodology

The private defendants argue that Landon has failed to perform the empirical and economic analyses that are required to support his conclusions regarding the alleged relevant market and harm to competition. Thus, according to the private defendants, Landon has

failed to utilize a reliable methodology and his testimony should be excluded.  Corey, however, argues that, rather than challenging Landon's methodology or reliability, the private defendants base their argument on an incorrect interpretation of the buyer-seller relationship in this transaction and are attacking merely Landon's analysis of the transaction at issue and the conclusions he draws based on that analysis.

"Defining the relevant market requires identification of both the product at issue and the geographic market for that product." Baily v. Allgas, Inc., 284 F.3d 1237, 1246 (11th Cir. 2002).  "'The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" Id. (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)).  "The relevant geographic market is 'the area of effective competition . . . in which the seller operates, and to which the purchaser can practically turn for supplies.'" Id. at 1247 (quoting Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961)). "Measurement of the relevant geographic market depends on a number of factors, including '[p]rice data and such corroborative factors as transportation costs, delivery limitations, customer convenience and preference, and the location and facilities of other producers and distributors.'" Id. at 1247-48 (quoting T.

*Harris Young & Associates, Inc. v. Marquette Electronics, Inc.*, 931 F.2d 816, 823 (11th Cir. 1991)).

As Landon notes in his report, in order to identify the product at issue and the relevant geographic market for that product, one must first identify who is the buyer and who is the seller in the given transaction. In most situations, it is quite easy to distinguish the buyer from the seller. The party who makes payment in exchange for goods or services is the buyer, while the party who receives payment is the seller. In other words, one need look only at the flow of money in the transaction: the money goes from the buyer to the seller. In this case, however, things are not quite so simple.

According to Corey and Landon, the City is the buyer and the concessionaire is the seller because the City pays the concessionaire a percentage of the total advertising proceeds in exchange for the design, installation, operation, maintenance, and management of the advertising boards at the Airport. Based on this analysis, Landon concludes that the relevant product is the collection of services regarding the management of the advertising space at the Airport and the relevant geographic market is the Airport itself. But according to the private defendants and their expert, Stephen D. Prowse, Ph.D., the seller is the City and the purchaser is the concessionaire (e.g, Clear Channel or Corey)

because the concessionaire buys advertising space from the City by leasing that space, which it then sells to advertisers in monthly increments. Based on this analysis of the buyer-seller relationship, Prowse concludes that the relevant product at issue is the right to sell advertising in the Airport and the geographic market is far broader than just the Airport since there is evidence that concessionaires consider the rights to sell advertising at certain other venues as substitutes for the right to sell advertising at the Airport.

In their initial brief in support of their motion to exclude Landon's testimony, the private defendants argue that, in determining the relevant product market, Landon failed to consider whether there are reasonable substitutes for the right to sell advertising space at the Airport and that he failed to study or even consider the cross-elasticity of demand between the right to sell advertising space in the Airport and possible substitutes. Furthermore, the private defendants argue that, in determining the relevant geographic market, Landon failed to consider whether concessionaires such as Corey and Clear Channel could turn to sellers in other geographic areas as alternative sources of supply for the right to sell advertising at the Airport or for substitutes for that right.

In response, Corey argues that, given his analysis of the buyer-seller relationship, Landon sufficiently considered the relevant factors. First, Corey argues that there are no reasonable substitutes for the product Landon identified to be the relevant product, viz., the collection of management services related to the advertising at the Airport. Since there are no substitutes for the product at issue, it was not possible to conduct any studies of cross-elasticities, and this is why Landon did not conduct any such studies. Second, Corey argues that Landon did not consider other geographic areas, including other airports, because it would have been "nonsensical" to do so, given Landon's identification of the Airport as the buyer. According to Corey, the private defendants' argument against the reliability of Landon's testimony is based on Prowse's analysis of the buyer-seller relationship at issue. Thus, rather than criticizing the reliability of Landon's method, the private defendants are rejecting Landon's analysis of the buyer-seller relationship and attacking the conclusions that Landon has reached.

The court agrees with Corey that the private defendants cannot use their analysis of the buyer-seller relationship in order to show that the methodology employed by Landon is unreliable and should therefore be excluded. Even the private defendants' own expert states that he believes "that there are buyer and seller

characteristics to both sides of the transaction, but it is more correct to view the City of Atlanta as the seller of advertising rights to the concessionaire." Expert Witness Report of Stephen D. Prowse at 13 [Doc. No. 497-5]. In addition, Landon testifies that, though he thinks it "more appropriate" to view the City as the buyer, he could understand "where you could look at it the other way." Deposition of John H. Landon at 165 [Doc. No. 496-4]. Accordingly, the court concludes that this is a substantive factual dispute and each expert is entitled to form his own opinion regarding this dispute. Thus, Landon is entitled to give his own analysis of the buyer-seller relationship and then to use that conclusion to frame his economic analysis of the relevant factors in determining the relevant product and geographic markets. For the purposes of this motion, the court will assume that the city is the buyer and the concessionaire is the seller. Even assuming, however, that Landon's analysis of the buyer-seller relationship is correct, the court concludes that he has failed to demonstrate that he has used a reliable methodology in reaching his conclusions. Simply put, there is too great an analytical gap between the data and the opinion that Landon offers as to the relevant market and as to whether there has been harm to competition in that market. Before looking at the content of Landon's report, the court will

note two points that seem relevant in explaining why Landon's report is deficient.

First, Corey filed its original complaint on November 4, 2004, and Corey's original complaint included its antitrust claims. The court's original scheduling order directed Corey to serve all Rule 26 expert disclosures by January 15, 2007 [Doc. No. 172], and Corey's counsel knew, or should have known, that they would need to retain an expert witness in order to establish the relevant market. Yet, as Clear Channel's counsel pointed out at the <u>Daubert</u> hearing, Corey did not retain Landon until January 4, 2007, a mere eleven days before Landon's report was due to be served. From the cover page of his report, it appears Landon completed his report on January 15, 2007, which was, fortuitously, just in time. Thus, Landon completed his research, conducted his economic analysis, and drafted his report in just eleven days. The substantive portion of his report in which he gives his opinions is nine pages; seven if you omit the two full page charts. These facts do not conclusively demonstrate that Landon's methodology is unreliable, but they do suggest part of the explanation as to why Landon failed to do the required analysis.

Second, it appears that Landon assumed that the allegations in the complaint were true and that those allegations constituted an antitrust violation as the starting point for his analysis, which

further explains the inadequacy and unreliability of his methodology. In his report, Landon states that he has "been instructed to assume arguendo that defendants engaged in behavior in violation of antitrust laws." Expert Report of John H. Landon at 3 [Doc. No. 496-5]. Furthermore, in his deposition, Landon states that he was "relying upon the assumption that there's been an antitrust violation, and then my job is to try to carve out a relative market given the assumed true and correctness of those allegations." Deposition of John H. Landon at 10 [Doc. No. 496-4]. Based on his assumption, Landon defined the relevant product as the collection of services related to managing the advertising located at the Airport and he defined the relevant geographic area as the Airport itself.

Of course Landon may assume that the factual allegations in the complaint are true for the purposes of framing his analysis, but he should not have made the additional legal assumption that the conduct alleged in the complaint constitutes an antitrust violation. The proper procedure would be to assume that the allegations in the complaint are true, use those allegations to determine what studies and analyses are required in order to define the relevant market, conduct the requisite research and define the relevant market, and then determine whether there has been harm in that market such that there is a violation of the antitrust laws.

Thus, in this case, Landon should have first assumed that the factual allegations contained in the complaint are true and then used those allegations as a starting point for defining the relevant market. Even taking the factual allegations in the complaint as true, it might turn out that the relevant market is such that there has been no antitrust violation. But by assuming that the allegations are true and constitute an antitrust violation, the expert is forced to define the relevant market such that a violation has occurred.

Suppose, for example, the court is adjudicating a contract dispute between two parties. According to the allegations in the hypothetical complaint, the defendant failed to deliver a widget to the plaintiff by January 1, 2008, and this failure to deliver constitutes a breach of Contract 1 between the plaintiff and defendant. In a motion to dismiss, the defendant argues that Contract 1 had been superseded by Contract 2, which states that the defendant is to deliver a gizmo instead of a widget on January 1, 2008, and, therefore, the defendant had no obligation to deliver a widget. In addition, the defendant contends that it delivered both a widget and a gizmo by January 1, 2008, but it does not raise this argument in its motion to dismiss since this claim is a factual one that will need to be raised at summary judgment after discovery has been conducted. Both parties agree that Contract 1 requires

delivery of a widget by January 1 and Contract 2 requires delivery of a gizmo instead of a widget by January 1, but they contest which contract governs. In such a scenario, the court would assume that the factual allegations in the complaint are true, i.e., that the defendant failed to deliver a widget by January 1, and then decide which contract was governing in order to determine whether there was a breach of contract. After assuming that the defendant failed to deliver the widget, it is still possible for the court to rule that Contract 1 is the governing contract or that Contract 2 is the governing contract, depending on the language of the contracts. After conducting an analysis of the two contracts, the court would then decide which contract governs and whether the defendant's failure to deliver constituted a breach of contract.

But if the court were to assume that the defendant failed to deliver the widget on time and that such failure constituted a breach of contract, then the court would not need to conduct any analysis of the two contracts in order to determine which one governs. Since Contract 2 does not require the delivery of a widget, the court would be forced to find that Contract 1 governed. If Contract 2 governed, then there would be no breach of contract, which would contradict the court's assumption that there was a breach. Thus, the court would have to hold that Contract 1 governs, but obviously this procedure is incorrect.

By way of further analogy, consider the following situation. Suppose that there are two hot dog stands, Stand A and Stand B, both of which are in Atlanta, Georgia. In addition, suppose that Stand A and Stand B are in the same neighborhood, Pine Dale, and on the same street, Oak Lane, and both of them sell the same brand of hot dogs, C-Brand Dogs. At first, Stand A and Stand B both sell their hot dogs for $1.25. Stand A then cuts the price of its hot dogs to $1.00. Stand B cannot compete and goes out of business. Stand B then sues Stand A for predatory pricing in violation of Section 2 of the Sherman Act. In order to establish such a claim, the plaintiff must prove that "(1) the prices complained of are below an appropriate measure of the predator's costs; and (2) the predator had a reasonable expectation of recouping its investment in below-cost pricing." Baily, 284 F.3d at 1244. The Eleventh Circuit has held:

> Determining whether recoupment of predatory losses is likely requires a close analysis of the structure and conditions of the relevant market. In order to recoup its losses, predators "must obtain enough market power to set higher than competitive prices, and then must sustain those prices long enough to earn in excess profits what they earlier gave up in below-cost prices."

Id. at 1245 (quoting Matsushita, 475 U.S. at 590-91). Thus, in order to support its claim, Stand B hires an expert to define the relevant market.

In order to begin her analysis, the expert may assume that the factual allegations in the complaint are true, i.e., she may assume that Stand A cut the price of its hot dogs to $1.00 and Stand B closed down because it could not compete. In determining the relevant product market, the expert would then need to identify reasonable substitutes for the hot dogs and to conduct the relevant studies to determine the reasonable interchangeability of use or the cross-elasticity of demand between hot dogs and substitute products. In determining the relevant geographic market, she would also need to consider, among other things, the area in which Stand A and Stand B operate and in which purchasers of hot dogs could turn to alternative sources of supplies. Thus, even in this simple example, the expert would need to conduct extensive research and economic analysis in order to determine the relevant market.

But suppose that, in addition to assuming that the factual allegations are true, she also assumed those allegations constitute an antitrust violation and then carved out the relevant market based on these assumptions. Assuming that the allegations constitute an antitrust violation, the expert would realize that she need not conduct the extensive studies and analysis discussed above. The assumption that there has been a violation strictly limits the possible definitions of the relevant market: her

definition must be such that a violation of the antitrust laws have occurred.

In this hypothetical case, the expert would have to define the relevant market extremely narrowly in order for the conduct to even possibly constitute an antitrust violation.  For example, suppose that she defined the relevant market as hot dogs in Atlanta.  Stand A's conduct would not constitute an antitrust violation on such a definition of the relevant market.  After all, Stand A would not be able to increase and sustain higher than competitive prices in order to recoup its losses.  If Stand A attempted to do so, then its customers could find other sellers of hot dogs in Atlanta to purchase at a lower price.  But if the expert's definition of the relevant market entails that Stand A's conduct is not an antitrust violation, then the expert's definition of the relevant market contradicts her original assumption that the conduct is a violation.  Thus, the expert would need to define the relevant market much more narrowly.  In this hypothetical case, it would seem that the expert would have to define the relevant market as Brand-C hot dogs on Oak Lane in Pine Dale.  If that's the relevant market, then Stand A has 100% of the market power, and only then would Stand A's price cut even plausibly constitute an antitrust violation.

When the defendant's counsel and the court then ask the
hypothetical expert why she did not consider any reasonable
substitute products, conduct any cross-elasticity studies, or look
at other sources of supply, she can reply that such studies and
analyses are impossible since Brand-C hot dogs on Oak Lane in Pine
Dale are unique, have no substitutes, and are supplied by only one
producer.  According to the expert, a hungry consumer who wants a
Brand-C hot dog on Oak Lane in Pine Dale has to go to Stand A.  In
fact, the expert is forced to give such a response because a more
thoroughly researched analysis will most likely result in a
definition of the relevant market that entails that Stand A did not
commit an antitrust violation.  After all, it seems that most
consumers would find a substitute located nearby if Stand A tried
to raise prices to a supracompetitive level.  Clearly, the expert's
initial assumption that Stand A's price cut constituted an
antitrust violation has corrupted her analysis.  Had she started by
assuming only that the factual allegations in the complaint are
true and then conducted the requisite studies, she would have
discovered that the true relevant market is significantly broader
than Brand-C hot dogs on Oak Lane in Pine Dale.  A similar problem
seems to have infected Landon's analysis.

At the <u>Daubert</u> hearing, the court specifically asked Corey's
counsel about Landon's deposition testimony that he had assumed an

antitrust violation prior to defining the relevant market. Corey's counsel noted that Landon is not an attorney and argued that Landon simply misspoke in his deposition. According to Corey's counsel, Landon assumed only that the factual allegations against Corey were true, which, as the court has already noted, is proper. The court, however, is not persuaded. After examining his report, rebuttal report, and his deposition testimony, the court finds that Landon did assume that there was an antitrust violation. First, on at least two separate occasions, Landon states explicitly that he began with the assumption that the alleged conduct of the defendants violated the antitrust laws. Second, looking at his testimony as a whole, that he began with the assumption that there was an antitrust violation is the best explanation as to why he did not do the required analysis. But even if he had not assumed that there was an antitrust violation, Landon's testimony is so deficient as to render it unreliable. Keeping in mind that the court will be applying Landon's analysis of the buyer-seller relationship, the court will now examine Landon's testimony.

In defining the relevant product market, Landon failed to meaningfully consider whether there were any substitute products for the service of managing the advertising in the Airport. At his deposition, the following exchange took place:

Q:    Okay.    Now  in  regard  to  the  relevant  market,
      there's a product  component  generally to relevant
      markets, correct?

A:    Or service component.

Q:    Product or service component.

A:    Or service component.  Yes, in this case it's the
      service   of   providing   the   required   work   in
      connection   with   advertising   in   the   Atlanta
      Hartsfield Airport.

Q:    Okay, and you would agree with me that in general
      products  –  how  would  you  define  competitive
      products in a given market?

A:    By looking at the competitive products in the given
      market, but I don't know how I would do it until
      you tell me what market we're talking about.

Q:    Well,  would  you  agree  that  products  generally  are
      competitive if buyers view them as substitutes for
      each other?

A:    Sure.   In  this  case,  the  buyer  is  the  Atlanta
      Hartsfield Airport, and the service being provided
      is the service of taking care of the advertising,
      and  so  the  people  that  identify  themselves  by
      bidding  would  be  the  competitors  to  provide  that
      service.

Q:    All right.   And did you  – would you agree that if
      a product is a – if product A is a substitute for
      product B, then both of those products A and B are
      in the same market?

A:    Well, it depends on what kind of substitute it is,
      whether  it's  a  close  substitute  or  a  distant
      substitute, but possibly.   I mean, it would–

Q:    Say a close substitute?

A:    Close substitute then it might be in the relevant
      market.

Q:    Okay.  And generally in economic terms, this is
      something that needs to be analyzed in determining
      what a market is, correct?

A:    Sure, and it was – and it was, in fact, analyzed in
      this case.  The people who presented themselves for
      the bidding were the people who thought they were
      substitutes for each other in providing the
      service.  Each of them presumably thought they
      could do a better job then the other, and they went
      through a bidding process to determine what the
      City of Atlanta thought.

Q:    What, if anything did you do to determine what
      substitutes there are in the market for the product
      or service?

A:    **I didn't have to in this case.**  They self-
      identified by bidding.

Deposition of John H. Landon at 199-200 [Doc. No. 496-4] (emphasis

added).   Landon admits unequivocally that he did nothing to

determine whether there were substitutes for what he has identified

as the relevant product, viz., the management of advertising at the

Airport.  Corey attempts to explain this deficiency by arguing that

Landon did not identify any reasonable substitutes because there

are none.  Furthermore, since there are no substitutes, it was not

possible for Landon to conduct any cross-elasticity studies.   In

addition, Corey claims that such studies are not necessary "when

the boundaries of an antitrust market can be determined by

examining practical indicia such as the product's unique and

distinct uses, qualities, price, price sensitivity, production

facilities, customers, and vendors." Brief in Response at 14 [Doc.

No. 497] (citing U.S. Anchor Manufacturing, Inc. v. Rule Industries, Inc., 7 F.3d 986, 995 (11th Cir. 1993)).  It is true that in U.S. Anchor Manufacturing the Eleventh Circuit stated, "'Reliable measures of supply and demand elasticities provide the most accurate estimates of relevant markets.  However, it is ordinarily quite difficult to measure cross-elasticities of supply and demand accurately.  Therefore, it is usually necessary to consider other factors that can serve as useful surrogates for cross-elasticity data . . . .'" U.S. Anchor, 7 F.3d at 995 (quoting International Telephone & Telegraph, 104 F.T.C. at 409). But the Eleventh Circuit then stated that, in defining the relevant product market, one such useful surrogate is "'the extent to which consumers consider various categories of sellers . . . as substitutes.'" Id. (quoting International Telephone and Telegraph, 104 F.T.C. at 409).  Thus, even though it may be difficult or impossible to conduct studies of and collect data directly related to cross-elasticities of supply and demand, possible substitutes should still be considered and analyzed in defining the relevant product market.

Furthermore, there is no indication that Landon examined any of the practical indicia suggested by Corey.  He simply concluded that there were no substitutes without explaining what studies he did or what analyses he conducted in order to reach his conclusion.

The closest Landon comes to providing such an explanation is when he states, "The contract at issue is a service contract. For the purchaser [the City], the only options are those available through the bidding process for which there are limited eligible parties, in fact there were only three responses to Atlanta's RFP." Expert Rebuttal Report of John D. Landon at 8 [Doc. No. 497-4]. Landon goes on to state, "There are no substitutes for this service [the management of the advertising at the Airport] to the purchaser, the City of Atlanta." Id. [Doc. No. 497-4]. But, as the Third Circuit has pointed out, the test for a relevant product market is not products that are reasonably interchangeable by a particular individual, but products that are "'reasonably interchangeable by consumers for the same purposes.'" Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 438 (3rd Cir. 1997) (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956)). Thus, Landon erred by basing his conclusion on only whether the City had any available substitutes once it issued the RFP. Instead, Landon should have examined what products consumers (in this case, cities) would consider to be reasonably interchangeable for management services of airport advertising in general. It appears that Landon's assumption that there has been an antitrust violation led him to fail to consider possible substitutes and led him to define the relevant market in an

unsuitably narrow fashion. Once one approaches the issue from the appropriate level of generality, it is at least possible that there are products that are reasonably interchangeable by cities for the same purpose as the product identified by Landon, and Landon could have conducted some sort of study and analysis in order to rule out these possible substitutes or to include them in the definition of the relevant market.

For example, one possible substitute that the private defendants suggest is the use of in-house personnel by a city to administer advertising in its airport, i.e., a city could have a current city department directly sell space to advertisers or create a new department to do so. On this view, the purpose of the management services is to generate revenue through advertising in an airport. Landon's own expert report supports that the use of in-house personnel to administer the advertising in airports is at least a possible substitute product. In his report, Landon states, "While the City of Atlanta could elect to establish a department to coordinate advertising services, it has, wisely elected not do so." Expert Report of John H. Landon at 6 [Doc. No. 497-2]. Thus, Landon acknowledges that the Airport could use in-house staff as a possible alternative, though he claims that such a choice would not be a wise one. But, of course, Landon's opinion that the choice would not be wise shows that there is such a choice.

In addition, Table 1 from Landon's expert report indicates that at least one city (Austin, Texas) does in fact itself administer the advertising of its Airport. Expert Report of John H. Landon at 7 [Doc. No. 497-2]. Thus, Landon could have investigated and determined what factors led Austin to choose to use its own staff to coordinate the advertising at its airport rather than purchase the management services of a private company. It could be that Austin considered paying a company to manage advertising in its airport, but it decided that it could save money by using in-house staff to sell the advertising. If cost drove its decision, this would suggest that cities do consider the use of in-house staff to be a reasonable substitute for paying a private company for the management of its airport advertising. But Landon did not give this possibility any serious consideration, much less conduct any studies or analyses to evaluate it.

Table 1 also indicates that the airport at Los Angeles does not have advertising at all. Id. [Doc. No. 497-2]. It could be that Los Angeles determined that the price of hiring a company to manage advertising at an airport is higher than the price of hiring a company to manage some other revenue generator, such as vending machines (the price being the difference between total revenue and the percentage paid to the management company). Thus, perhaps Los Angeles decided to purchase the management of vending machines

rather than the management of advertising. On this view, the purpose of the management services is to generate money for the city, and so one would have to evaluate whether there are other services that cities could purchase instead of the management of advertising in response to price increases and whether cities generally consider these services as reasonably interchangeable with the services at issue. Landon, however, failed to do any such investigations or analyses in this case.

Of course, all of this is mere speculation and armchair economic analysis, and perhaps there are no reasonable substitutes for the product identified by Landon. But that is not the point; after all, the court is not the expert witness. The point is that it seems that it is at least possible that there are substitutes for the management of the advertising at the Airport, and, by his own admission, Landon failed to do anything (other than look at who bid for the contract) to determine and consider possible substitutes for that product at issue. Thus, Landon has failed to establish that he used a reliable method in giving his definition of the relevant product market.

Landon's definition of the relevant geographic market is similarly lacking. Landon defines the relevant geographic market as the Airport. For example, in his rebuttal report, Landon states, "Atlanta has but one international airport, in which the

services at issue can be supplied, and those services could only be supplied by a very limited universe of potential contractors having the ability to satisfy the requirements of the RFP and having participated in the bid process." Rebuttal Report of John D. Landon at 8 [Doc. No. 497-4]. It is true that the management services are to be performed at the Airport, but that is irrelevant since the relevant geographic area in this case is the area of effective competition in which Clear Channel operates and to which the City can practicably turn for the supply of management services. It is obvious that Clear Channel operates outside of the Airport and competes with companies that are not located in the Airport. It is also obvious that the City could look for companies outside of the Airport itself to come to the Airport and manage the advertising there. Initially, at least, it seems that the relevant geographic market could be national or even global. Clear Channel has its headquarters in Chicago, yet it competed for the Airport advertising contract. Furthermore, the Airport could hire a company that is located anywhere in the world to come to the Airport and manage its advertising. But perhaps it is cheaper and more convenient for the Airport to hire only management companies in the United States or in the South or perhaps an even smaller subregion. Regardless, Landon should have considered these factors (such as the effective area in which Clear Channel operates and

competes and the City's preferences due to price and convenience) rather than simply defining the relevant geographic market as the area where the services are to be performed. Again, it seems that Landon's assumption that there has been an antitrust violation has led him to fail to do any serious analysis of the relevant factors and ultimately to give a much too narrow definition of the relevant geographic market.

In an attempt to overcome these deficiencies, Corey argues that Landon utilized a reliable methodology by applying the United States Department of Justice Merger Guidelines ("Merger Guidelines"). In his report, Landon quotes in part the following section of the Merger Guidelines:

> A market is defined as a product or group of products and a geographic area in which it is produced or sold such that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future producer or seller of these products in that area likely would impose at least a "small but significant and nontransitory" increase in price, assuming the terms of sale of all other products are held constant.

Expert Report of John H. Landon at 4 (quoting Merger Guidelines at § 1.0) [Doc. No. 496-5].[4] Landon next states, "Under the [Merger Guidelines], a 'natural monopoly' is, by definition, the relevant market for evaluating anti-competitive conduct. The coordination

---

[4]Horizontal Merger Guidelines, United States Department of Justice and Federal Trade Commission. Issued April 2, 1992, revised April 8, 1997. Available at http://www.usdoj.gov/atr/public/guidelines/horiz_book/hmg1.html

of advertising services at the Atlanta Hartsfield airport is a natural monopoly, and thus is the relevant market for evaluating the antitrust claims of Corey Airport Services." Id. [Doc. No. 496-5]. Landon then proceeds to explain that a natural monopoly is "a market in which for technical or social reasons, there cannot be more [than] one efficient provider of a good or service" and argues that the management services of the Airport advertising is a natural monopoly. Id. at 5 [Doc. No. 496-5]. Even assuming, however, that Landon's analysis of natural monopolies is correct and his conclusion that the management of the advertising at the Airport constitutes a natural monopoly under his definition, it is still not clear how Landon has applied the Merger Guidelines in this case, much less that he has done so reliably.

First, according to the Merger Guidelines, consideration and analysis of possible substitute products and consumer responses to price increases are essential in defining the relevant market. For example, the Merger Guidelines state, "Market definition focuses solely on demand substitution factors – i.e., possible consumer responses." Merger Guidelines at § 1.0. Additionally, in the paragraph after the text quoted by Landon, the Merger Guidelines state:

> In determining whether a hypothetical monopolist would be in a position to exercise market power, it is necessary to evaluate the likely demand responses of consumers to a price increase. A price increase could be made

113

> unprofitable by consumers either switching to other
> products or switching to the same product produced by
> firms at other locations.  The nature and magnitude of
> these two types of demand responses respectively
> determine the scope of the product market and the
> geographic market.

Merger Guidelines at § 1.0.  Thus, according to the Merger

Guidelines, in defining the scope of the relevant market, one must

consider possible substitute products and consumer responses to

price increases; Landon did neither.

Second, the Merger Guidelines do not mention natural

monopolies, and it seems that, even if the management of the

Airport advertising is a natural monopoly, such a natural monopoly

is not by definition the relevant market for evaluating allegations

of antitrust violations.  Recall the definition of a market set

forth in the Merger Guidelines and quoted by both Landon in his

report and by Corey in its brief.  Suppose that a profit-maximizing

firm that has been awarded the Airport advertising contract

attempted to impose "a small but significant and nontransitory"

increase in the price it charged for managing the Airport

advertising.  The firm could not unilaterally impose such an

increase in price because it would be contractually bound to charge

the amount set forth in the bid accepted by the City and specified

in the contract.  Furthermore, though the term of the contract

would be for five years, the 2002 RFP grants the City the right to

terminate the contract for convenience.  2002 RFP §§ 2.14 and

2.11.7 [Doc. No. 465-26] ("The CITY shall have the right to terminate any of the work under the Contract, in whole or, from time to time, in part, at its convenience by giving CONSULTANT five (5) days prior written notice of its election to do so, by specifying the extent to which the performance of the work terminated, and by specifying the effective date of such termination."). Accordingly, in response to any attempted price increase, the City, as the consumer, could terminate the contract for default or convenience and look for an alternative substitute product such as the ones the court examined previously or look for an alternative supplier of management services for the Airport advertising. Thus, even if the management services of the Airport advertising constitute a natural monopoly as Landon claims, such a natural monopoly is not by definition the relevant market under the Merger Guidelines.

Once one considers substitute products and the City's possible responses to any significant and nontransitory price increases, it seems clear that the relevant market is much broader than Landon claims. Again, the court acknowledges that this analysis might be incorrect, but, since Landon is Corey's proffered expert, the burden is on Corey and Landon to show that Landon has employed a reliable method. If he has applied the Merger Guidelines, then Landon must still show that he has done so reliably, and his

citation to the <u>Merger Guidelines</u> without explaining how he applied them is insufficient to rehabilitate his lack of analysis in defining the relevant product and geographic markets. Therefore, the court finds that Corey and Landon have failed to demonstrate that Landon has employed a reliable methodology in defining the relevant market in this case. In addition, since Landon's testimony as to harm to competition is based on his definition of the relevant market, Landon cannot establish that he employed a reliable methodology in giving his opinion with regard to harm to competition.

### c. Whether the Expert Testimony Will Assist the Trier of Fact

Given that the court has found serious flaws with the reliability of Landon's methodology, the court also finds that Landon's testimony would not assist the trier of fact. To the extent that his testimony is relevant, its probative value is far outweighed by the possibility that the trier of fact would give too much credence to his testimony given that he has a Ph.D. in economics, even though Landon cannot demonstrate that he used a reliable methodology in reaching his conclusions.

To summarize, it appears that, though he is qualified to give expert testimony, Landon's assumption that the factual allegations Corey makes in its complaint constitute an antitrust violation caused him to fail to do the requisite analysis in order to

reliably support his definition of the relevant market. In defining the relevant product market, Landon failed to identify and consider possible substitutes for the product he identified, i.e., the management of advertising at the Airport. In defining the relevant geographic market, Landon failed to consider alternative sources of supply from which the City could obtain this product or reasonable substitutes of that product. In addition, it is not clear how Landon applied the Merger Guidelines, and it appears that he actually misapplied them in this case. Finally, because Landon has failed to establish that he employed a reliable methodology in reaching his conclusions, the risk that his testimony might mislead or confuse the trier of fact outweighs any probative value that his testimony might have. For all of these reasons, the court grants the private defendants' motion to exclude the testimony of Landon [Doc. No. 496].

### 2. Corey's Antitrust Claims

The court notes that it held in a previous order that Corey has antitrust standing to bring this suit [Doc. No. 89 at 48]. The private defendants urge the court to reconsider its prior ruling on the grounds that (1) the court was ruling on a motion to dismiss, and, therefore, the court's decision was limited to the pleadings and assumed Corey's allegations to be true and (2) there is recent case law that supports the private defendants' argument that Corey

lacks antitrust standing.  These arguments are not without force, but the court does not need to reconsider whether Corey has antitrust standing.  Even assuming for the purpose of summary judgment that Corey has such standing, the court concludes that all of Corey's antitrust claims ultimately fail.  For this reason, the court will assume that Corey has antitrust standing for the purpose of the motions for summary judgment and will rule on the merits of Corey's claim.  See Levine v. Central Florida Medical Affiliates, 72 F.3d 1538, 1545 (11th Cir. 1996) (declining to decide whether the plaintiff had antitrust standing because, even assuming that the plaintiff did have standing, the plaintiff had failed to establish any violation of the antitrust laws).  The court will now consider Corey's antitrust claims in light of its exclusion of Landon's testimony and Corey's failure to define the relevant market.

### a.    Conspiracy to Unreasonably Restrain Trade

Section One of the Sherman Act states, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1. Sections Four and Sixteen of the Clayton Act provide the basis for bringing civil lawsuits by those who are damaged due to violations of Section One.  15 U.S.C. §§ 15 and 26; see also McGuire Oil Co.

v. Mapco, Inc., 958 F.2d 1552, 1555 (11th Cir. 1992).  In order to establish a Section One claim, a plaintiff must prove (1) that there is an agreement to restrain trade and (2) that the agreement is unreasonable.  Levine, 72 F.3d at 1545.  "In identifying which agreements unreasonably restrain competition, the Supreme Court has held that certain kinds of agreements are unreasonable per se, such as agreements among direct competitors to fix prices or to restrict output."  Id. at 1545-46.  If the allegedly unreasonable agreement at issue does not fall within one of the per se categories, then the court analyzes the agreement under the 'rule of reason.'  Id. at 1546.  Under the rule of reason analysis, courts "engage in a comprehensive analysis of the agreement's purpose and effect to determine whether it unreasonably restrains competition."  Id.  In this case, the private defendants claim that Corey does not allege any conduct that falls within a per se category, and, therefore, the court should apply the rule of reason analysis.  Corey does not dispute this claim.  Accordingly, the court will apply the rule of reason.

The court notes that, in its previous order ruling on the motions to dismiss, the court held that all of Corey's antitrust claims required that Corey sufficiently plead a relevant market. [Doc. No. at 37].  In support of its holding, the court cited, among other cases, All Care Nursing Services, Inc. v. High Tech

<u>Staffing Services, Inc.</u>, 135 F.3d 740, 749 (11th Cir. 1998), in

which the Eleventh Circuit held:

> "[T]o satisfy the rule of reason, the plaintiff must
> prove that the [conduct] had an adverse effect on
> competition." <u>Coffey v. Healthtrust, Inc.</u>, 955 F.2d
> 1388, 1392 (10th Cir. 1992). But, competition occurs
> only in a market. Thus, "before we can reach the larger
> question of whether [defendants] violated any of the
> antitrust laws, we must confront the threshold problem of
> defining the relevant market." <u>Thompson v. Metropolitan
> Multi-List, Inc.</u>, 934 F.2d 1566, 1572 (11th Cir. 1991).

In a footnote, the Eleventh Circuit then held:

> Because this case is subject to the rule of reason and
> because of the importance of relevant market and market
> power in evaluating the reasonableness of a purported
> restraint, the district court's jury instructions and
> interrogatories directing that the jurors must find for
> defendants if plaintiffs failed to establish the relevant
> market were proper applications of the law governing this
> case.

<u>Id.</u> at n.15. Though the parties have not raised this issue, the

court's research has shown that, contrary to <u>All Care Nursing</u>, it

is not the case that the definition of the relevant market is a

threshold issue for all Section One claims analyzed under the rule

of reason. The court has not found any case law in which the

Eleventh Circuit explicitly overruled the holding in <u>All Care

Nursing</u> quoted above, but Supreme Court and Eleventh Circuit

precedent (including Eleventh Circuit precedent subsequent to <u>All

Care Nursing</u>) have held that a plaintiff does not have to prove the

relevant market for Section One claims in which the plaintiff can

show actual, as compared to potential, detrimental effects to

competition.  See, e.g., FTC v. Indiana Federation of Dentists, 476
U.S. 447 (1986); Levine, 72 F.3d at 1545 (11th Cir. 1996); Spanish
Broadcasting System of Florida, Inc. v. Clear Channel
Communications, Inc., 376 F.3d 1065, 1071-72 (11th Cir. 2004);
Schering-Plough Corp. v. FTC, 402 F.3d 1056, 1065 (11th Cir. 2005).
Because the court rejected the private defendants' argument that
Corey's Section One claim should be dismissed because Corey failed
to sufficiently plead a relevant market, the court's application of
the All Care Nursing standard did not prejudice either party.  For
the purposes of summary judgment, however, the court will now apply
the test set forth by the Eleventh Circuit in Levine and developed
in subsequent Eleventh Circuit cases, a test which the Eleventh
Circuit based on the Supreme Court's ruling in Indiana Dentists.

      "Under Eleventh Circuit case law, alleged Section One
agreements analyzed under the rule of reason require a plaintiff
'to prove (1) the anticompetitive effect of the defendant's conduct
on the relevant market, and (2) that the defendant's conduct has no
pro-competitive benefit or justification.'"  Spanish Broadcasting,
376 F.3d at 1071 (quoting Levine, 72 F.3d at 1551).  "In alleging
the anticompetitive effect of the defendant's conduct, an antitrust
plaintiff must show harm to competition rather than to competitors.
That is, the anticompetitive effects are measured by their impact
on the market rather than by their impact on competitors."  Id. at

1071–72 (internal quotations omitted). In order to prove that there has been an anticompetitive effect on the market, a plaintiff "may either prove that the defendants' behavior had an 'actual detrimental effect' on competition, or that the behavior had 'the potential for genuine adverse effects on competition.'" <u>Levine</u>, 72 F.3d at 1551 (quoting <u>Indiana Dentists</u>, 476 U.S. at 460–61).

In setting forth the above test in <u>Levine</u> for whether there has been an anticompetitive effect on the market, the Eleventh Circuit relied upon the case of <u>Indiana Dentists</u>, 476 U.S. 447. <u>See</u> <u>Spanish Broadcasting</u>, 376 F.3d at 1073 (citing <u>Levine</u>, 72 F.3d at 1551). In <u>Levine</u>, the Eleventh Circuit held that, in order to show that the conduct at issue had the potential for adverse effects on competition, a plaintiff must, as a threshold requirement, define the relevant market. <u>Levine</u>, 72 F.3d at 1551; <u>Spanish Broadcasting</u>, 376 F.3d at 1073. The Eleventh Circuit has noted, however, that <u>Indiana Dentists</u> carved out an exception to the requirement that a plaintiff must define the relevant market and prove market power, and it appears that this exception applies when a plaintiff can show actual detrimental effects on competition. <u>Schering-Plough Corp.</u>, 402 F.3d at 1065.

Since the court has excluded the testimony of Landon and since the definition of the relevant market must be based on expert testimony, Corey cannot establish a relevant market. And since

Corey cannot prove the relevant market, Corey cannot establish the potential for adverse effects on the market. Thus, unless Corey can provide sufficient evidence of actual detrimental effects on competition, Corey's Section One claim must fail. For this reason, the court will now examine Indiana Dentists in closer detail in order to see whether Corey has offered evidence of actual anticompetitive effects sufficient to withstand summary judgment.

In Indiana Dentists, an association of dentists issued a rule requiring its members to refuse to comply with insurance companies' requests to submit x-rays with insurance claim forms. 476 U.S. at 449. In response to the demands of policyholders, dental health insurers had begun to offer plans in which payment of benefits was limited to "the least expensive yet adequate treatment" based on the individual patient. These "alternative benefits" plans required that the insurer evaluate the diagnosis and recommendation of the treating dentist. In order to conduct these investigations, the insurers began to frequently request that dentists submit dental x-rays along with their claim forms. Many dentists viewed this review by insurance companies as threatening their professional independence and income. Id. One group of such dentists formed the Indiana Federation of Dentists and promulgated a rule for its members that forbade them from complying with the insurance companies' requests to submit x-rays with claim forms.

<u>Id.</u> at 451.  The Federation had less than 100 members, but its membership was highly concentrated in three Indiana communities, and two in particular.  The Federation was able to enlist almost 100% of the dentists in one of those communities and approximately 67% in another.  In those areas, the Federation was successful in enforcing its rule against submitting x-rays with claims forms. <u>Id.</u>

The Federal Trade Commission ("FTC") objected to the actions taken by the Federation and issued a complaint against it.  After lengthy proceedings, including a full evidentiary hearing, the FTC held that the Federation had engaged in an unfair method of competition in violation of Section 5 of the Federal Trade Commission Act by implementing and enforcing the rule forbidding its members from complying with insurers' requests to submit x-rays with insurance claim forms.  Accordingly, the FTC ordered the Federation to cease and desist its efforts to enforce its rule or otherwise organize dentists to resist the insurers requests for x-rays.  The FTC made its ruling on the basis that the dental association's implementation and enforcement of its rule constituted a conspiracy to unreasonably restrain trade and thus was illegal under the standards developed by the Supreme Court for judging such restraints in light of Section 1 of the Sherman Act. <u>Id.</u> at 451-52.  The Federation appealed the decision of the FTC,

and the Seventh Circuit Court of Appeals vacated the order on the ground that the decision was not sufficiently supported by the evidence. Id. at 453. The Seventh Circuit held, among other things, that the Commission had failed to give a precise definition of the market in which the Federation was alleged to have restrained trade and it failed to establish that the Federation had sufficient market power to restrain competition in that market. Id.

On appeal to the Supreme Court, the Federation again argued that the FTC's conclusion that it had engaged in an unreasonable restraint of trade was erroneous as a matter of law because the FTC had failed to sufficiently define the market. Id. at 460. The Supreme Court rejected this argument and held the FTC's "failure to engage in detailed economic analysis" did not vitiate its finding that the challenged conduct constituted an unreasonable restraint of trade under the rule of reason analysis. Id. The Supreme Court noted that the FTC had found that the Federation constituted heavy majorities of the practicing dentists in two of the local communities and that, in those areas, insurers were unable to obtain compliance with their requests over a period of years. The Supreme Court then held, "Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on

competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects." Id. at 460-61 (internal quotations omitted). The court went on to hold, "[T]he finding of actual, sustained adverse effects on competition in those areas where [Federation] dentists predominated, viewed in light of the reality that markets for dental services tend to be relatively localized, is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis." Id. at 461. Thus, the Supreme Court carved its exception very narrowly and limited it to cases where a plaintiff (or the FTC) can show actual, sustained adverse effects on competition. In this case, however, Corey has failed to provide such evidence.

As the court has already held, Landon's testimony regarding harm to competition is based on his definition of the relevant market. Since his definition of the relevant market is unreliable and has therefore been excluded, Landon's testimony regarding harm to the relevant market has also been excluded. Thus, the best evidence presented by Corey of actual harm to competition is an email indicating that JCDecaux, an airport advertising company, chose not to compete in the 2002 RFP process because it believed that the City was content with Clear Channel and was not looking to

change to another company.  Ex. 32 to Plaintiff's Statement of Facts.  The email also indicates that JCDecaux formed this belief because of the terms of the 2002 RFP and the way in which the City conducted the bidding process (especially the failure of the City to timely respond to questions posed by JCDecaux).  <u>Id.</u>  But a lone email indicating the loss of a single competitor in a single bidding process that took place for a rather short duration of time does not mean that there has been actual, sustained harm to competition.

In <u>Indiana Dentists</u>, the FTC found that in the areas where the Federation held power, the Federation was successful in enforcing its rule over a period of years, such that dental insurers were unable to obtain the compliance of the area dentists for those years in submitting x-rays along with claim forms.  476 U.S. at 460.  On those facts, the Supreme Court affirmed the FTC's holding that the Federation's rule was an unreasonable restraint on trade, even though the FTC had failed to give a detailed economic analysis of the relevant market.  In the case at hand, however, Corey has failed as a matter of law to provide sufficient evidence such that the trier of fact could reach a similar finding of actual, sustained harm to the market.  Taking the evidence presented in the light most favorable to Corey, the court concludes that, at best, one possible competitor, JCDecaux, chose not to participate in the

2002 RFP process and that Corey, as an individual competitor, may have been harmed as a result of the conduct at issue. But the evidence does not show that there has been sustained, actual detrimental effects on the market itself. Because Corey cannot show either actual detrimental effects on competition nor can it show potential detrimental effects on competition, Corey's Section One claim must fail. Accordingly, the court grants the private defendants' motions for summary judgment as to these claims.

### b. Monopolization and Attempted Monopolization

Corey also alleges that the private defendants monopolized and attempted to monopolize the relevant market in violation of Section Two of the Sherman Antitrust Act. Again, the private defendants argue, among other things, that Corey has failed to establish the relevant market and that the definition of the relevant market is crucial to Corey's monopolization and attempted monopolization claims.

Section Two of the Sherman Act states, "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . ." Again, Sections Four and Sixteen of the Clayton Act provide the basis for bringing civil lawsuits by those who are damaged due to violations of Section Two

of the Sherman Act.  15 U.S.C. §§ 15 and 26; see also McGuire Oil,
958 F.2d 1552 at 1555.

"The offense of monopoly under § 2 of the Sherman Act has two
elements: (1) the possession of monopoly power in the relevant
market and (2) the willful acquisition or maintenance of that power
as distinguished from growth or development as a consequence of a
superior product, business acumen, or historic accident."  United
States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966); see also
Morris Communications Corp. v. PGA Tour, Inc., 364 F.3d 1288, 1293
(11th Cir. 2004).  The Supreme Court has held that it "is generally
required that to demonstrate attempted monopolization a plaintiff
must prove (1) that the defendant has engaged in predatory or
anticompetitive conduct with (2) a specific intent to monopolize
and (3) a dangerous probability of achieving monopoly power."
Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 457 (1993); see
also Levine, 72 F.3d at 1555 (holding that, in order to establish
a claim "for attempted monopolization, a plaintiff must show (1) an
intent to bring about a monopoly and (2) a dangerous probability of
success.").

The Supreme Court held it is "beyond doubt" that a claim for
monopolization "requires proof of market power in a relevant
market" and that "demonstrating the dangerous probability of
monopolization in an attempt case also requires inquiry into the

relevant product and geographic market and the defendant's economic power in that market." Spectrum Sports, 506 U.S. at 457. In this case, Corey has failed to define the relevant market. Thus, Corey cannot establish its claim for monopolization, nor can it establish its claim for attempted monopolization. Accordingly, the court grants the private defendants' motions for summary judgment as to these claims.

### c. Conspiracy to Monopolize

As the court has already noted, in its previous order denying the private defendants' motion to dismiss, the court held that all of Corey's antitrust claims required that Corey sufficiently plead a relevant market. The court cited Bill Beasley Farms, Inc. v. Hubbard Farms, 695 F.2d 1341, 1343 (11th Cir. 1983), for the proposition, "In the Eleventh Circuit, it is clear that definition of a relevant market is a necessary element of a claim for conspiracy to monopolize." [Doc. No. 89 at 41]. Though the parties have not raised this issue, the court, having conducted further research, comes to the conclusion that this issue is not as clear as it might first seem.

In Levine, the plaintiff alleged, among other things, that one of the defendants monopolized, attempted to monopolize, and conspired with the other defendants to monopolize the local market of certain physician medical services in violation of Section Two

of the Sherman Act.  72 F.3d at 1555 (citing 15 U.S.C. § 2).  The district court granted summary judgment, and the plaintiff appealed.  In addressing the plaintiff's Section Two claims, the Eleventh Circuit began by setting forth the elements for a claim of monopoly, which includes showing that the defendant had market power, and the elements for a claim of attempted monopolization, which includes showing that the defendant has at least a dangerous probability of successfully monopolizing the market because it is close to achieving monopoly power.  Levine, 72 F.3d at 1555.  The Eleventh Circuit then held:

> A claim for conspiracy to monopolize, on the other hand, does not require a showing of monopoly power.  Instead, a plaintiff proves a section 2 conspiracy to monopolize by showing: "(1) concerted action deliberately entered into with the specific intent of achieving a monopoly; and (2) the commission of at least one overt act in furtherance of the conspiracy."

Id. at 1556 (quoting Todorov v. DCH Healthcare Authority, 921 F.2d 1438, 1460 n.35 (11th Cir. 1991)).  The Eleventh Circuit went on to hold that the plaintiff had failed to adequately define the relevant market and had failed to show that the defendants possessed or were close to possessing market power and that these failures were fatal to his claim for monopolization and attempted monopolization.  Levine, 72 F.3d at 1556.  But, rather than affirm the district court's grant of summary judgment on the plaintiff's claim of conspiracy to monopolize on the same grounds, the Eleventh

Circuit held that the plaintiff had failed to present sufficient evidence that the defendants had possessed the specific intent to monopolize, and, therefore, the plaintiff's claim for conspiracy to monopolize also failed. Id. Based on the Eleventh Circuit's ruling in Levine, it would seem that the definition of the relevant market is not essential for a claim of conspiracy to monopolize. A subsequent Eleventh Circuit case, however, casts doubt on this conclusion.

In Spanish Broadcasting, the plaintiff initially alleged in its first amended complaint, among other things, that the defendants had attempted to monopolize the advertising purchased in the major Spanish-language radio markets in the United States. 376 F.3d at 1070. The district court dismissed with prejudice the plaintiff's first amended complaint on the grounds that the plaintiff had failed to meet the minimum pleading requirements for its antitrust claims. Id. The plaintiff then filed a motion for reconsideration and for leave to amend along with a proposed second amended complaint that included the additional claim that the defendants conspired to monopolize the market for Spanish-language radio advertising. After considering the second amended complaint, the district court held that the plaintiff still failed to meet the minimum requirements for stating an antitrust claim. Accordingly,

the district court denied the motion, and the plaintiff appealed.
Id. at 1077-78.

After upholding the dismissal of the plaintiff's first amended complaint, the Eleventh Circuit reviewed the district court's denial of the motion for leave to amend. The Eleventh Circuit began by stating, "The Supreme Court has emphasized that leave to amend must be granted absent a specific, significant reason for denial . . . ." Id. at 1077 (citing Forman v. Davis, 371 U.S. 178, 182). The Eleventh Circuit therefore concluded that its review of the denial of the motion for leave to amend turned on its "assessment of whether the proposed complaint indeed failed to state a claim for relief." Spanish Broadcasting, 376 F.3d at 1078. In addressing the claim for conspiracy to monopolize, the court held:

> Conspiracy under Eleventh Circuit law requires (1) an agreement in restraint of trade (2) deliberately entered into with the specific intent of achieving a monopoly (3) which could have had an anticompetitive effect and (4) at least one overt act in furtherance of the conspiracy. U.S. Anchor, 7 F.3d at 1001. As with the Section One allegations in the first complaint, we agree with the district court that SBS has not alleged facts that would support a finding of "anticompetitive effect" in **the relevant market**. That is, we still do not believe that [the plaintiff] has alleged facts sufficient to support a finding of harm to competition.

Spanish Broadcasting, 376 F.3d at 1078. (emphasis added). Thus, the Eleventh Circuit affirmed the district court's denial of the motion for leave to amend. Id. at 1079.

133

The holding in <u>Levine</u> is difficult to reconcile with the holding in <u>Spanish Broadcasting</u>. On the one hand, the Eleventh Circuit held that the plaintiff in <u>Levine</u> had failed to adequately define the relevant market and had failed to establish the requisite market power of the defendants and that these failures were fatal to the plaintiff's claims of monopolization and attempted monopolization. The Eleventh Circuit went to some lengths to point out that the plaintiff's claim for conspiracy to monopolize did not require a showing of market power before then holding that the plaintiff's conspiracy claim failed for a different reason, namely, the plaintiff had failed to present any evidence that the defendants had possessed the specific intent to monopolize, which is an essential element of a conspiracy to monopolize.

On the other hand, in <u>Spanish Broadcasting</u>, the Eleventh Circuit held that the plaintiff had failed to state a claim for conspiracy to monopolize because the plaintiff had failed to allege facts sufficient to support a finding of anticompetitive effect in the relevant market, viz., harm to competition. If a plaintiff does not have to establish the relevant market in order to prevail on a conspiracy to monopolize claim, then it seems that the plaintiff in <u>Spanish Broadcasting</u> would not have had to plead facts that would support a finding of anticompetitive effect in the

relevant market in order to state a claim since the plaintiff would not have had to ultimately prove the relevant market to win its claim.  But if a plaintiff has to sufficiently plead facts that would support a finding of anticompetitive effects in the relevant market in order to state a claim for conspiracy to monopolize, then it seems that the Eleventh Circuit could have held in <u>Levine</u> that the plaintiff's conspiracy claim failed for one of the same reasons that his claims for monopolization and attempted monopolization failed, i.e., because he had failed to adequately define the relevant market.  Since the Eleventh Circuit did not mention the failure to define the relevant market in relation to the conspiracy claim and ultimately held that the conspiracy claim failed because the plaintiff had failed to present evidence of the specific intent to monopolize, it seems that the Eleventh Circuit did not conclude that the failure to adequately define the relevant market was fatal to his claim for conspiracy to monopolize.  For these reasons, it is not clear to this court whether a plaintiff has to present sufficient evidence to support his definition of the relevant market in order to survive a motion for summary judgment as to a claim for conspiracy to monopolize.

Keeping in mind this apparent tension in the relevant Eleventh Circuit precedent, the court holds that Corey's claim for conspiracy to monopolize must fail nevertheless.  If a plaintiff

must adequately define the relevant market in order to withstand a motion for summary judgment, then Corey's claim must fail because the court has excluded the testimony of Landon. If, however, a plaintiff is not required to provide an adequate definition of the relevant market, Corey's claim still must fail because Corey has not produced sufficient evidence to support a finding that the private defendants had the specific intent of achieving a monopoly, which is an essential element of a conspiracy claim. Accordingly, the court grants the private defendants' motions for summary judgment as to Corey's claim for conspiracy to monopolize.

In summary, the court grants the private defendants' motions for summary judgment as to all of Corey's antitrust claims set forth in Counts IV and V in its Second Amended Complaint.

**Conclusion**

For the foregoing reasons, the court:

(1)     GRANTS IN PART AND DENIES IN PART Barbara Fouch's motion for summary judgment [Doc. No. 447];

(2)     DENIES the City of Atlanta's motion for summary judgment [Doc. No. 448];

(3)     DENIES Ben DeCosta's motion for summary judgment [Doc. No. 450];

(4)     DENIES Adam L. Smith's motion for summary judgment [Doc. No. 451];

(5)     DENIES Carolyn Chavis's motion for summary judgment [Doc. No. 453];

(6)     DENIES Kyle Mastin's motion for summary judgment [Doc. No. 457];

(7)     DENIES Hubert Owen's motion for summary judgment [Doc. No. 459];

(8)     GRANTS IN PART AND DENIES IN PART James Riley, Michael Riley, and John McNeany's motion for summary judgment [Doc. No. 463];

(9)     GRANTS IN PART AND DENIES IN PART Clear Channel Airports of Georgia, Inc. and Clear Channel Outdoor, Inc.'s motion for summary judgment [Doc. No. 464];

(10) GRANTS Clear Channel Airports of Georgia, Inc. and Clear Channel Outdoor, Inc.'s motion in limine to exclude evidence and testimony of plaintiff's proffered expert witness John H. Landon [Doc. No. 496];

(11) GRANTS IN PART AND DENIES IN PART the joint motion to exclude the testimony of Brett Katzman [Doc. No. 571];

(12) GRANTS IN PART AND DENIES IN PART the joint motion to strike the declaration of Steve Moody [Doc. No. 575]; and

(13) DISMISSES AS MOOT Barbara Fouch's motion to strike the declaration of Steve Moody [Doc. No. 576].


SO ORDERED, this <u>30th</u> day of September, 2008.


<u>/s/ Charles A. Pannell, Jr.</u>
CHARLES A. PANNELL, JR.
United States District Judge